**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------  X

BRENDAN SULLIVAN,                                          :

                                                       :        **DOCKET NO.:**

                                                       :

                           Plaintiff,                  :        **COMPLAINT**

               v.                                       :

                                                       :

                                                       :        **Jury Trial Demanded**

SUNG KOOK ("BILL") HWANG,                                  :

ARCHEGOS CAPITAL MANAGEMENT,                               :

LP, ARCHEGOS CAPITAL                                       :

MANAGEMENT, LLC, THE GRACE AND                             :

MERCY FOUNDATION, INC.,                                    :

ARCHEGOS FUND LP, EWM LLC, d/b/a                           :

EWM GLOBAL, ANDY MILLS, DIANA                              :

PAE, BRIAN JONES, SCOTT BECKER, and                        :

PATRICK HALLIGAN,                                          :

                           Defendants.                 :

--------------------------------------------------------  :

**COMPLAINT**

Plaintiff Brendan Sullivan ("Sullivan"), by and through his undersigned counsel, Brown Rudnick, LLP, hereby alleges, as and for his Complaint against Archegos Capital Management, LP, Archegos Capital Management, LLC (collectively, "Archegos"), The Grace & Mercy Foundation (the "Foundation"), Archegos Fund LP (the "Fund"), EWM LLC, d/b/a EWM Global, ("EWM"), Sung Kook 'Bill' Hwang, Patrick Halligan, Brian Jones, Andy Mills, Scott Becker, and Diana Pae (collectively with Hwang, Halligan, Jones, Becker, and Mills, the "Executive Defendants") as follows:

**NATURE OF THE ACTION**

1.     This action arises from the collapse of Archegos, an investment firm owned by Sung Kook ("Bill") Hwang who, along with the Executive Defendants (1) fraudulently induced

his employees to invest their hard-earned compensation back into his firm; (2) recklessly invested that re-invested compensation and lied to cover-up their actions and the associated risks; and (3) lost that re-invested compensation entirely as a result of their recklessness and lies.

2.      Hwang has been notorious on Wall Street for nearly two decades.  He founded two funds, both of which eventually imploded due to his own reckless and illegal activities and both of which led to criminal prosecutions.  In each case, Hwang initially generated significant returns in strong markets, but ultimately succumbed to a narcissistic and unsustainable need to always generate extraordinary returns irrespective of market conditions even if he needed to break the law to do so.

3.      Hwang's first firm, Tiger Asia, enjoyed early success before it collapsed.  In the wake of that collapse, authorities charged Hwang with market manipulation and insider trading, fined him tens of millions of dollars, and banned him from trading on certain exchanges or managing external money.  Thereafter, in 2013, he reconstituted a "family office" called Archegos using $500 million of his ill-gotten gains.  His pathological megalomania not only remained but deepened after the public disgrace of Tiger Asia.  He tried to repair his image, mask his avarice, and induce investment professionals to join his firm with phony claims of rehabilitation and self-proclaimed religiosity, "I am the money guy who teaches the Bible to pastors," he declared often. Over time, however, especially after the COVID pandemic arrived, he and the Executive Defendants transformed the business into a personality cult where loyalty to Hwang, not performance, was paramount and where questioning and dissent were not tolerated.  So-called "good followers" who demonstrated agreement with whatever Hwang said or wanted were openly praised and rewarded; those who offered honest assessments or questioned actions or policies received personal abuse, lower compensation, and adverse professional treatment.

4.      The result, however, was the same.  Like Tiger Asia, after Archegos enjoyed success in a strong market, Hwang resorted to reckless and illegal trading to sustain his addiction to unsustainable oversized returns during the pandemic.  Archegos' collapse eclipsed that of Tiger Asia and constitutes on of the most catastrophic fund collapses in history.   On April 27, 2022, Hwang and Executive Defendant Patrick Halligan were arrested by federal agents based on an indictment for federal racketeering and fraud charges the crux of which the United State Attorney for the Southern District of New York described as follows:

5.      They lied about how big Archegos' investments had become. They lied about how much cash Archegos had on hand. They lied about the nature of the stocks that Archegos held. And we allege that they told those lies for a reason, so that the banks would have no idea that Archegos was really up to a big market manipulation scheme.

6.      Sullivan is a former Archegos employee who contributed substantial parts of his bonus compensation—some mandatory, some elective—to a Deferred Compensation Plan (the "Plan").  He entrusted those earnings to Hwang and the Executive Defendants as fiduciaries and depended on them to manage those savings prudently, honestly, and in the Sullivan's best interest. Hwang and the Executive Defendants betrayed that trust, and Sullivan lost all those deferred earnings.

7.      Although sold to employees as an employee benefit, Hwang never viewed the Plan as such or tried to fulfil the fiduciary responsibilities that attached to managing such an employee benefit.  Rather, Hwang saw the Plan as a means of avoiding truly compensating employees at all. Indeed, he viewed the "compensation" he offered employees as gratuitous because his narcissistic pathology made it impossible for him to credit anyone else with contributing to the firm's success. To the contrary, he loudly took exclusive credit for all firm success and told employees they should

be compensating him.  His psychological inability to share credit or fairly compensate his people led him to create the Plan so he could "award" bonuses while not actually losing control over that capital for trading purposes.  This was paramount to Hwang because his trading strategy depended on maximizing leverage (borrowing) for which the capital that would otherwise be used for compensation would serve as collateral if it remained with the firm.

8.      Although the Plan was ostensibly "voluntary," in fact, it was not.  Rather, Hwang and the Executive Defendants fraudulently induced and coerced employees into "investing" in the Plan.  They did so by materially misrepresenting Hwang's trading strategy, its risk profile, and the security of employee baseline contributions.  One critical "inducement" was Hwang's personal guarantee, communicated directly by him and ubiquitously by the Executive Defendants, that employee balances in the Plan would not be allowed to drop below their baseline contributions and would be restored if it did.  Equally critical, Hwang and the Executive Defendants misrepresented that the Plan contributions would be invested only in highly-liquid stocks to minimize the risks of Hwang's highly leveraged strategy.  Finally, Hwang and the Executive Defendants repeatedly misrepresented, especially in the months leading up to the firm's collapse that the portfolio was "well-hedged" and maintained large cash reserves to protect the Plan against market volatility.

9.      Hwang and the Executive Defendants also relied on a relentless pressure campaign to coerce employees into making maximum contributions to the Plan.  The most blatant tactic employed was requiring employees to make their Plan election **before** Hwang awarded bonuses and making it clear that whether they elected to contribute and in what amount would be a major factor in his bonus decision.  The message was crystal clear.  No contribution.  No bonus.  Protests about this practice were ignored and the protestors punished.

10.     Under federal ERISA law and state common law, by agreeing to manage the Plan and "inducing" employees to invest their compensation in the Plan, Archegos, Hwang and the Executive Defendants assumed fiduciary duties to the Plan and its participants, including Sullivan. Those duties included duties to exercise the utmost care and loyalty in managing these funds.

11.     Like Tiger Asia, initially Archegos enjoyed great success.  From 2013 to 2019, Archegos' high-leverage, high-liquidity trading strategy (focused on stocks like Amazon, Google, and Netflix) was extremely successful in a strong market.  With the outbreak of the COVID-19 pandemic in March 2020, however, Hwang, like the market generally, was gripped with uncertainty and concerns about a financial crisis similar to 2008.  These fears escalated when Archegos lost 70% of its portfolio value in the early pandemic's stock market decline.  It was a dramatic decline, but Hwang told employees he was able to manage the risk because the portfolio consisted of highly liquid stocks that could be liquidated quickly, and the Executive Defendants told employees that if the portfolio ever dropped below $1 billion, Hwang would de-risk even more drastically to protect the capital.

12.     However, Hwang's pathological megalomania simply would not allow him to do anything prudent as did other asset managers at the time or anything other than continuing to pursue oversized returns irrespective of the market reality, risks, or challenges.  Accordingly, after the crash, he abandoned the high-liquidity leg of his trading strategy and shifted almost entirely to highly concentrated investments in illiquid stocks that he hoped to drive higher  through heavy leverage-based buying.  This would generate oversized returns that would serve Hwang's emotional needs and allow him to borrow even more debt against this collateral until, he believed, the overall market crisis passed and he could somehow unwind those illiquid positions in a better market environment.

13.     As Hwang began executing this new, much riskier strategy, he and the Executive Defendants concealed this seismic shift in trading strategy and risk and repeatedly assured he Plan participants that Archegos was maintaining prudent and adequate hedges, cash reserves, and would sell off positions to realize profits and maintain the same relative risk profile as before.   By December 2020, Hwang's new strategy had generated substantial profits but had done so with a misrepresented risk profile used to induce the Plan participants to not withdraw their deferred compensation or leave the firm.

14.     Based on the Plan's year-end returns, Hwang and the Executive Defendants' repeated assurances, and basic investment prudence required as fiduciaries, employees expected Hwang to begin to take down these positions, realize profits for the Plan, and avoid ongoing market risks.   Any remotely responsible asset manager, especially a fiduciary managing employee contributions to the Plan, would have done so.   And Hwang and the Executive Defendants promised he would begin doing so in late 2020.   However, he did not.   Instead of slowing down on the curve as Hwang promised he would do, he sped up.   He continued buying massive amounts of shares into 2021 (often becoming those companies' largest shareholder), regularly exceeded his margin limits, and vastly increased the illiquidity and vulnerability of his portfolio.   This trading was beyond reckless, it was self-destructive.

15.     As Hwang ran the red lights that he and the Executive Defendants saw and well understood, they cut off employees' access to daily trading information and portfolio transparency so that the employees could not see the same red lights.   Hwang and the Executive Defendants also created a CYA paper trail to justify their actions in the event those actions ended catastrophically.   This included having Archegos analysts retroactively justify these risky

investments by generating "bullish" research and altering their pricing targets to justify Hwang's continued purchasing.

16.     At the same time, and unknown to employees, Hwang and the Executive Defendants ignored prime brokers' calls, messages, concerns, and threats to make margin calls if more collateral was not put up or positions taken down and lied to them about the portfolio and its holdings to avoid those margin calls.  The also lied to employees to conceal these material risks. Hwang finally sped off the cliff in March 2021.   Starting on March 22, 2021, ViacomCBS—one of the stocks Hwang had aggressively purchased throughout 2020—lost nearly a third of its value over two days.  Because of Archegos' misrepresented risk profile and troubled relationship with its prime brokers, the decline caused almost immediate margin calls on billions of dollars in positions.  Archegos collapsed.

17.     The actions of Hwang and the Executive Defendants were fraudulent and egregious breaches of their fiduciary obligations under both federal and state law.  This action seeks equitable relief and monetary damages to redress violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2), 29 U.S.C. §§ 1132(a)(1)(B), 29 U.S.C. §§ 1132(a)(3), breaches of contract and fiduciary duty, as well as fraud, civil conspiracy, fraudulent inducement, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, negligent misrepresentation, negligence, tortious interference with a contract, and professional negligence/malpractice.  This action seeks to hold each of the Defendants jointly and severally liable directly, indirectly, and/or through alter ego liability.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action asserts claims arising under the laws of the United States, specifically, ERISA, 29 U.S.C. § 1003 *et seq.*

7

19.     This Court has supplemental subject matter jurisdiction over Sullivan's related state law claims pursuant to  28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over each Defendant because they are either residents of this District, employed and working on a full-time basis within this District at a position directly related to this action, are businesses headquartered in this District, or have taken specific acts in this matter within the District sufficient to subject them to jurisdiction of this Court.

21.     Further, all Executive Defendants worked out of the Archegos' New York City office and for all associated work for the Grace and Mercy Foundation, including all time periods relevant to this matter.

22.     Upon information and belief, Hwang maintained multiple residences in New York City and New Jersey, and would travel daily to the New York office.

23.     Upon information and belief, Pae would travel daily into the New York office.

24.     Upon information and belief, Mills maintained a residence in New York City, and would travel daily into the New York office.

25.     Upon information and belief, Jones maintained a residence in New York City, and would travel daily into the New York office.

26.     Defendant Archegos Fund L.P. is a Delaware Limited Partnership, headquartered in New York, New York, and registered to do business in New York as a foreign limited partnership.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the unlawful practices and actions alleged herein, occurred in this District:  Specifically, Archegos and the Foundation are principally located at, and operated out of offices located at 888 Seventh

Avenue, New York, New York 10106.  Additionally, the Fund was administered in this District at Archegos' offices, and upon information and belief, Archegos, Hwang, and the other Executive Defendants conducted business with the prime brokers related to this action within the District. Moreover, Sullivan—as a former Archegos employee—worked out of Archegos' office, entered into contracts with Archegos within the District (governed by New York law), and the breaches and violations of law giving rise to this action, including Defendants' misrepresentations and conspiracy, were all centered on actions taken in this District.

## PARTIES

28.    Sullivan Brendan Sullivan is a former Managing Director at Archegos.  At all relevant times, Mr. Sullivan was a resident of New York, and is currently a resident of Tennessee.

29.    Defendant Sung Kook ("Bill") Hwang is the founder and principal of Archegos.  At all relevant times, upon information and belief, Hwang was a resident of New York, and upon information and belief, is currently a resident of New Jersey.

30.    Defendant Archegos Capital Management, LP is a Delaware limited partnership, registered to do business in and headquartered in New York, New York, with its principal place of business located at 888 Seventh Avenue, 38th Floor, New York, New York 10106.

31.    Defendant Archegos Capital Management, LLC is a limited liability corporation, registered to do business in and headquartered in New York, New York, with its principal place of business at 888 Seventh Avenue, 38th Floor, New York, New York 10106.

32.    Defendant the Grace and Mercy Foundation, Inc. (the "Foundation") is a Delaware corporation with private foundation status under Section 501(c)(3) of the Internal Revenue Code headquartered in New York, New York with its principal place of business located at 888 Seventh Avenue, New York, New York 10106.

33.     Defendant Andy Mills is the former Executive Chairman and co-CEO of Archegos and the current co-Chairman of the Foundation. Mills was the Executive Chairman of Archegos from June 2014 to June 2021; and was the co-CEO of Archegos from 2019 to June 2021. Upon information and belief, Mills is a resident of Massachusetts.

34.     Defendant Diana Pae was the co-President of Archegos from July 2014 to June 2021 and is the current Global Chief Operating Officer for the Foundation.  Upon information and belief, Pae is a resident of New Jersey.

35.     Defendant Brian Jones is the former co-President of Archegos. Jones joined Archegos in 2016 and served as co-President through 2021.  Upon information and belief, Jones is a resident of Texas.

36.     Defendant Patrick Halligan is the former Chief Financial Officer of Archegos. Halligan joined Archegos in 2001 and served as Chief Financial Officer through 2021. Upon information and belief, Halligan is a resident of New York.

37.     Defendant Scott Becker is the former Chief Risk Officer of Archegos.  Upon information and belief, Becker is a resident of New York.

38.     Defendant EWM LLC, d/b/a EWM Global, is a Connecticut corporation headquartered in Connecticut with its principal place of business at 1177 Summer Street, 6th Floor, Stamford, Connecticut 06905.

39.     Defendant Archegos Fund L.P is a Delaware Limited Partnership, headquartered in New York, New York, and registered to do business in New York as a foreign limited partnership.

## **FACTUAL ALLEGATIONS**

I.      **Hwang's Criminal Wall Street Beginnings.**

40.     Hwang is a notorious Wall Street asset manager.  From the inception of his career, Hwang exhibited megalomaniacal delusions of grandeur, entitlement, and a brazen willingness to

break the law. This disordered and unbounded personality generated volatile performance with Hwang earning billions through market manipulation, insider trading, and wildly oversized investment gambles and then losing billions when those schemes and gambles unwound. The collapse of Archegos was just the latest in this cycle.

41.     Hwang began his investment career as a protégé of the well-known hedge fund manager Julian Robertson. Beginning in the 1980's, Robertson's fund, Tiger Management Corp., turned a small initial investment into a $22 billion juggernaut that pioneered the modern hedge fund industry. Hwang joined Tiger Management in 1996 and became one of Robertson's "Tiger Cubs" when Robertson gave him millions to manage in Hwang's own fund called Tiger Asia Management, LLC ("Tiger Asia") in 2001. Tiger Asia managed a number of funds that primarily focused on equities traded on the Hong Kong Stock Exchange ("HKEX"). Over the next several years, Tiger Asia achieved stunning returns, turning Robertson's initial investment into a fund that managed nearly $10 billion at its peak in 2008. This success was based in part on a series of insider trading and market manipulation schemes.

42.     One such scheme involved trading on embargoed material non-public information ("MNPI") procured from large financial institutions to whom Hwang had promised confidentiality in exchange for the opportunity to purchase large, off-exchange block shares in Chinese companies that were publicly traded on the HKEX. Specifically, Hwang's Tiger Asia agreed to a common industry practice called a "wall-crossing" in which Tiger Asia committed to not trade on or disclose MNPI it received as part of these block share transactions until that information became public upon the subsequent prearranged sale of the block at a discount. The agreement not to use the MNPI to trade was a threshold condition on being offered these opportunities, which were very lucrative to funds like Tiger Asia.

43.     For Hwang, however, these highly lucrative opportunities were not enough, and his "wall-crossing" promise to not trade was not genuine.  Instead, Hwang would instruct Tiger Asia's traders to short sell the relevant stock in the weeks leading up to the discount purchase date.  This artificially depressed the subsequent price of the previously arranged already discounted purchase and also allowed Hwang to reap short sale profits when the price further declined after the large block sales were announced.

44.     Hwang also had Tiger Asia regularly manipulate month-end closing prices of stocks listed on the HKEX that the fund had shorted to artificially "paint the tape" with month-end paper profits entitling Hwang to higher management fees.  Typically, Hwang had traders make large share purchases hours before closing to artificially inflate the share price and then sell those shares and short others in the final minutes of the trading to artificially inflate the paper values of the positions.

45.     This program of fraudulent schemes led the SEC and other law enforcement and regulatory agencies across the world to move against Hwang.   In 2012, the SEC sued Hwang and Tiger Asia for securities fraud and the DOJ charged Tiger Asia criminally for the same illegal schemes.  Ultimately, Hwang (on behalf of Tiger Asia) pled guilty in December 2012 to criminal wire fraud charges, and Hwang and Tiger Asia agreed to pay $44 million to settle the SEC's civil charges.  That same month, the Japanese Securities and Exchange Surveillance Commission ("SESC"), with assistance from the SEC, concluded an investigation into Tiger Asia, and recommended the imposition of an administrative monetary penalty of approximately $816,500 based on Tiger Asia's "market manipulation" of shares of Yahoo Japan.  In January 2013, the SEC imposed further punishment on Hwang pursuant to Section 203(f) of the Advisors Act, barring him from "association with any broker, dealer, investment advisor, municipal securities dealer,

municipal advisor, transfer agent, or nationally recognized statistical rating organization" for five years.

46.     The Hong Kong Securities and Futures Commission ("SFC") also investigated Hwang and Tiger Asia, and in 2014 the Hong Kong's Market Misconduct Tribunal ("MMT"), an independent tribunal with jurisdiction to enforce Hong Kong's securities laws, found that Hwang was well aware of the implications of being "wall-crossed," but cast those responsibilities aside, engaged in an insider trading scheme which relied on "blatant breaches of trust," and that "the ultimate responsibility for the market misconduct . . . was [Hwang]."  The MMT imposed approximately $5.8 million in penalties on Hwang and Tiger Asia and issued a "cold shoulder order," banning him from trading securities in Hong Kong for four years.

47.     Hwang's career managing other people's money was seemingly over.  Tiger Asia was forced to return all outside capital to investors and shut down.

## II.     Hwang Forms Archegos After Tiger Asia Collapses.

48.     After Tiger Asia was shut down, Hwang reconstituted his operation as a so-called "family office" with hundreds of millions of dollars of his ill-gotten Tiger Asia gains.  Far from humbling him, Hwang's legal troubles and professional disgrace fed his grandiose persona, reflected in the name of his new family office, "Archegos," which is a biblical term for someone who "leads the way for others," such as a "prince," "captain," leader," and "trailblazer," and which is also used to refer to Jesus Christ.

### A.     Hwang, Pae, and Mills Induce Sullivan to Work at Archegos.

49.     Sullivan began his career as an analyst in investment banking and private equity. Hwang and Sullivan met casually in 2011 and stayed in touch thereafter.  In 2014, Hwang solicited Sullivan to join Archegos with the boast that he had generated returns in excess of 130% the year before and would eventually make Sullivan a portfolio manager.  This was a major inducement for

Sullivan, who wanted to manage capital. Sullivan was further induced to join on the promises of unparalleled investment opportunities based on sound long-term strategies, a "family" atmosphere that Hwang said he intended to create, and promises that the new firm would take the utmost care in its ethical and legal responsibilities, which Hwang emphasized by touting his purportedly significant investment in compliance personnel.

50. To further induce Sullivan to join Archegos, Hwang, Pae, and Mills all separately stressed that Hwang had learned from his prior legal problems. They stressed that Hwang's prior troubles had deeply humbled him and generated a deep commitment to ethical and legal practices. Trying to reinforce this narrative, Hwang frequently regaled Sullivan with descriptions of the significant time and money he purportedly donated to his church and other charitable causes.

51. Hwang, Pae, and Mills' promises of an eventual portfolio manager role and assurance that the business would be ethical and legal convinced Sullivan to join Archegos as an analyst and director in July 2014. He would later be promoted to Managing Director and throughout most of his time at Archegos report to Mills, Jones, and Hwang. Sullivan's focus was the technology and media industries for which he provided research and analysis of approximately 50-75 stocks at any given time.

**B.**     **A**rchegos Evolves into a Personality Cult.

52. Contrary to the strident promises Executive Defendants used to recruit Sullivan to the firm, and the veneer they initially placed over the firm's real operations, internally Archegos was not run like a professional money management firm. From the start, it instead was operated like Hwang's personal fiefdom and platform for him to pursue his oft-stated grandiose goal of becoming "the richest person in the world." Over time, it developed more and more characteristics of a personality cult in which Hwang was more and more focused on employee submission and adulation than performance and talent. These pathological and dysfunctional characteristics

became acute in the 2020 pandemic as Hwang strained under increased performance pressure and embarked on a reckless trading campaign that he and the Executive Defendants misrepresented to, and concealed from, employees and Sullivan.

53.     Central to this toxic culture was the relentless message, disseminated explicitly and implicitly, that what the firm valued most, and what was essential to succeed at the firm, were employees who were "good followers" with unquestioning loyalty to, and trust in, Hwang personally. Hwang justified such fealty based on the singular credit he claimed for all of the firm's successes. During the years Archegos performed well, Hwang regularly asked employees why he was paying them, and would state "you should be paying me" and "I'm the reason for this result, you are lucky to work for me."

54.     In this environment, Hwang and the Executive Defendants tolerated no questioning or even hints of dissent. To enforce this culture, Hwang and the Executive Defendants publicly squashed even the slightest perceived challenges to his judgment, strategy, and authority, often through very public rebukes and reprimands. For example, if an employee raised questions about Hwang's investment strategy or proposed an alternative privately, Hwang would often copy the firm in a reply that disparaged and demeaned the employee and the employee's thoughts. Other suspect employees were targeted with personal recriminations and criticisms about their physical appearances and personal beliefs, especially religious beliefs. For example, Mills once told an employee they could stand to "skip a few meals." During another dinner meeting, Hwang told an employee that they needed to lose weight.

55.     Hwang constantly cloaked himself in a loud religiosity and messaged to the firm that this religiosity was the driving force for the firm and its principles. Interview questions often

revolved around religion and an investigation into a candidate's religious upbringing. This inquiry and monitoring continued once the employee joined the firm.

56.     For example, during annual performance reviews, Hwang often spent the majority of time purporting to evangelize his religious beliefs and "requesting" that the employees devote more time to their faith and that they and their families attend the internal scripture readings that were funded by his purported charitable Christian foundation, Defendant Grace and Mercy Foundation (the "Foundation"). This pressure was a big part of the firm's mandatory off-site retreats, where among other things, employees were required to stand before the firm and declare what they were grateful for. Those who declared they were grateful for God, Hwang, and Archegos received high praise and manufactured applause. Employees who outwardly displayed similar devotion in the office received praise and advancement. Conversely, employees who Hwang and the Executive Defendants did not perceive as sufficiently embracing this compelled devotion and group think were privately and publicly singled out as untrustworthy and accused of personal and professional deficiencies.

57.     Hwang's ostensible religiosity also provided cover to the Foundation that he actually used for the benefit of himself, his family, and his closest confidants. The Foundation, although technically distinct from Hwang and Archegos, was, in fact, merely an alter ego of both, with the same offices, effective leaders and control figures, and support staff. The two entities also regularly intermingled finances.

58.     Hwang treated the Foundation as indistinct from Archegos, regularly ignoring lines between the Fund, his own finances, and the Foundation. Hwang regularly and informally moved money and shares from Archegos accounts to the Foundation, and his family's own private non-fund accounts, utilized Archegos staff, administrative functions, and resources to operate the

Foundation, and in all respects used his complete dominance and control to operate the Foundation for his own purposes.  Hwang used his Archegos employees to aid him in setting up trusts for the Foundation and personal investment accounts and otherwise to set up the Foundation as an alternative cash vehicle where Hwang and select "good followers" could go and be insulated from creditors in the event Archegos failed.

59.     Indeed, Hwang and the Executive Defendants would explicitly refer to The Foundation as a safe haven for themselves and potentially others when discussing risk at Archegos. These descriptions became more frequent and explicit in 2020-2021 as Hwang and the Executive Defendants dangled potential positions at The Foundation before employees as one of the several means of deflecting employee concerns, pressuring them to remain, and, for some, inducing them to lie or remain silent about the fraudulent scheme that eventually imploded Archegos.

60.     The Executive Defendants – in particular Hwang, Pae, Mills, and Jones – did in fact try to use the Foundation as a safe haven when the Archegos Fund bottomed out.  Indeed, this option was the topic of not infrequent statements by Hwang attempting to assuage concerns among employees and induce loyalty to Hwang and for some – especially Pae, Mills, and Jones – active participation in his schemes.  These statements became more pronounced as Archegos began to fail.  For example, Hwang, desperate to stall an employee and capital exodus and avoid employees pursuing civil and regulatory legal claims and perhaps criminal complaints, told Sullivan and other employees on March 26, 2021 that the plan to move forward was to either move employees over to the Foundation to run their asset management division, form their own asset management companies using the Foundation's capital, or form "Archegos 2.0" and plan a smaller family office using the Foundation's capital. Each of these plans had one consistent thread – misappropriation of Foundation capital.

C.      **The Executive Defendants Were Central Participants in Hwang's Scheme.**

61.     It would have been impossible for Hwang to execute his 2020-21 scheme without the endorsement and active support of the Executive Defendants.  Each of these Defendants were fully aware of the scheme, including most importantly, the lies to prime brokers and employees upon which it utterly depended, and they not only facilitated those lies by not objecting to or correcting them, but actively promoted those lies themselves.

62.     Mills served as the co-CEO of Archegos.  In this position, he operated as Hwang's "right hand man," in charge of managing Archegos' relationships with its prime brokers, monitoring all trading activity, investment strategy, and playing an active role in analyst research and investment presentation. Mills was the first of the Executive Defendants to join Hwang in 2001, and he was lock step with Hwang in all decisions because "he knew where the bodies were buried." Internally, Mills served as the management team's primary spokesperson, regularly communicating the firm's goals, performance, and policies to all employees.  Mills played a key role in creating the Plan, using it to retain capital for trading, and in forcing employees to participate in it by any means necessary. It was Mills who encouraged Hwang to implement the Plan in 2016 and was the strongest proponent of tying up employee investment into the Fund. Mills saw the benefits of using the Plan to indenture employees to Archegos and engineer the loyalty Hwang and Mills desired. It was Mills with Hwang who were the two most authoritative promoters of the lies to prime brokers and employees that the scheme depended on, and he quarterbacked the dissemination of those lies by the other Executive Defendants under his direction.  More fundamentally, Mills fully knew that the employees were being materially misled and facilitated that deception through his affirming silent presence when lies were being made, his affirmative statements, and his breaches of fiduciary duty.

63.     Pae served as co-president and head of human capital management at Archegos.  In that position, she was in charge of all hiring and employment decisions, including compensation policies.  Additionally, Pae played a role in the firm's investing and attended most Archegos investment strategy meetings.

64.     Pae was also instrumental in creating the Plan and making it operational.  Along with Mills and Hwang, Pae worked with Archegos corporate counsel, Ropes & Gray, to design the strategy for the Plan, deciding which employees would be allowed to participate, and crafting how the Plan documents would be drafted. Notably, Pae also played a key role in administering the Plan and was one of the strongest proponents of the Plan often referred to as its "cheerleader." Pae coordinated with the Plan administrator EWM to manage the Plan accounts and decide how much value should be reflected in each account. Every year, Hwang and Mills tasked Pae with leading the re-enrollment process and ensuring all employees invested the maximum amount.  Pae personally would contact each employee to confirm their renewed participation in the Plan at the maximum amount and overcome any reluctance to do so by assuaging concerns, touting the opportunity, and, where necessary, threatening adverse action.

65.     Mills, Pae, and Hwang facilitated the Plan formation.  Mills and Pae worked with Archegos' corporate counsel to design the Plan, and Mills and Pae held the first employee meeting in October or November 2016 to induce the employees, including Sullivan, to join the Plan. At this meeting, Mills and Pae assured the employees that no matter what the "principal will be protected," and that their deferred compensation would increase each year commensurate to the Fund's gross return for that year. Mills and Pae claimed that "the investment is only upside" and there was "no downside risk."  Mills and Pae promised that even if the Fund were to under perform in one year, their deferred compensation and any increase from the prior calendar year would not

be affected.  Mills and Pae's message was clear, this was an opportunity to "invest back into the Fund, [and] invest in Bill" which no "good follower" could reasonably turn down. Sullivan and the employees were further pressured by Mills and Pae's explanation that Archegos's corporate counsel had informed Archegos that a minimum threshold of employee participation was needed to start the Plan, and that without 100% participation from the "Key" employees at the meeting the Plan could not be properly launched.

66.     In this role, Pae helped to induce Sullivan to join the Plan, and kept him invested in the Plan by emphasizing that the Plan was based on low-risk, long-term trading strategies and was Bill's way of being "generous" to his employees.  She also assuaged his concerns by touting Hwang's prudent investment approach and his serious concern for managing employee investment.  For example, in late 2019 before bonus awards were communicated, Sullivan deferred less than the maximum amount, and was confronted by Pae.  When Sullivan explained he was concerned about investing too much money in the Fund,  Pae diminished his concerns by touting Hwang's long-term approach and consistent performance and reassuring him that there was a guaranteed floor on employee contributions to the fund.  Pae stated "we all know Bill will make money over the next five years and you need to trust him," "there is a guaranteed floor," and Hwang took the responsibility of managing employee money "very seriously."  In addition, she made clear to Sullivan, as she and Mills would to other employees, that Hwang would be upset if they did not participate fully in the Plan and that it would affect whether and what amount of bonus they received – since employees were forced to opt into the Plan prior to being awarded their bonus.

67.     If, in her view, employees were slow to re-enroll, Pae would hound these employees and pressure them to confirm their participation, often telling them they were one of the last

employees to do so.  If employees chose to defer less than the maximum allowable amount of their bonus, Pae would badger these employees and question why they were not electing the maximum, hoping to shame them into full participation and encourage them to be the "good followers" Hwang desired.   Once the Plan achieved 100% participation, Pae would send a firm-wide email congratulating Archegos employees on their complete participation.

68.     Most significantly, as set forth below, Pae was one of the senior executives who misrepresented Hwang's plans and actions and their associated risks during the period 2020-2021 period from which these claims arise.  She was one of the most frequent interface with employees increasingly asking for information on Hwang's trading activities with their deferred compensation, and she was the most frequent source of the ubiquitous misrepresentations fed at Hwang and Mills direction, especially materially misrepresenting the extreme leverage behind Hwang's positions and trading intentions, the existence of hedges and cash reserves, and the relationship with the firm's various prime brokers. She also remained silent when Hwang and other Executive Defendants misrepresented these same facts despite having a duty to speak given her senior role at the firm and being a fiduciary of the Plan. She did so with full knowledge that what she and others were saying was untrue for the express purpose of furthering the reckless and fraudulent scheme Hwang was pursuing.

69.     Jones served as the co-president and director of research at Archegos.   In this position, he was primarily in charge of managing Archegos' relationships with its outside network (*i.e.*, connecting Hwang to executives and CEOs of companies Archegos was contemplating investment in), assisting to drive its investment strategy, and managing the team of analysts.  Jones coordinated bi-weekly meetings with the analysts to review what everyone was working on, and then would update Hwang and the rest of the management team.   Jones also contributed to

discussions with the prime brokers as Archegos sought more trading partners.  Additionally, Jones was involved with the Plan and provided Hwang direction and consultation as to how employee funds should be managed. Jones, like Pae and Mills, impressed upon employees the importance of deferring the maximum allowed amount into the Plan "if [they] knew what was right for [their] career."

70.     Jones was the top proponent of using the idea of the Fund-of-One to induce employees, including Sullivan, to invest the maximum amount in the Plan and remain at the firm even though he knew there was no reasonable prospect of Hwang delivering on those prospects, especially when those promises were forcefully announced in the fall of 2020.  The Plan was presented as a means to accelerate their opportunity to run their own Fund under Archegos' umbrella, an inducement that was critical to Sullivan.  Jones, along with Hwang, Pae, Halligan, and Mills, would emphasize that employees who were selected to manage a Fund-of-One within Archegos would have the option to transfer in their own deferred compensation and be allowed to manage their own money.  Jones led Sullivan and other employees to believe that the deferred compensation would continue to gain value, and that employees would be allowed to manage parts of it themselves. Yet, Jones knew that the Fund-of-One could not and would never be funded by the Plan assets.

71.     Jones too was intimately involved in Hwang's reckless and fraudulent investment scheme during the 2020-2021 period; knowingly misrepresented Hwang's plans and actions and their associated risks as part of the scheme the Executive Defendants were an essential part of and manipulated research to create fake cover and alibis in the event the scheme imploded or was otherwise the subject of regulatory or law enforcement action.

72.     Halligan served as Archegos' CFO.  In that position, he oversaw all accounting and internal finance activities for Archegos, and was a key part of the firm's management.  Halligan also worked side-by-side with Hwang, Becker, and Mills to manage the firm's relationships with its prime brokers.  Specifically, Halligan corresponded with the prime brokers at the end of each trading day to settle Archegos' accounts and coordinated efforts closely with the Archegos trading team.  Halligan also oversaw many the firm's finance and administrative back-office functions at Archegos, including managing payroll, bonus awards and payments, 401k elections, and office space planning and provided the same functions for the Foundation.

73.     Halligan played a critical role in the Plan's administration, and was responsible for tracking the daily, weekly, monthly, and yearly returns of the Plan.  Additionally, Halligan was a key player in the firm's purported risk management, including managing liquidity, cash on hand, hedges, reserves, and other de-risk options.

74.     As CFO, he was viewed as one of the most authoritative sources of information to employees on the firm and the Plan and in that capacity affirmatively mispresented material facts to Sullivan and others about both in the 2020-21 period in furtherance of Hwang's scheme, including misrepresenting the nature and size of positions, liquidity, cash on hand, the existence of hedges and reserves, the risk profile, and the Plan for managing risk and capturing gains as well as endorsing and covering for other lies on the same topics by Hwang and the other Executive Defendants.  Halligan was one of the primary messengers for the same lies made to Archegos' prime brokers during the same period, lies for which he is now subject to a federal indictment and suit by the Securities and Exchange Commission ("SEC") and the Commodity and Futures Trading Commission ("CFTC").   He along with the other Executive Defendants promoted these exact same lies to Sullivan and employees who were far less informed and sophisticated and far more

vulnerable than the highly skilled and informed prime brokers with direct insight into Archegos' trading who were nevertheless bilked of tens of billions.

75.     Importantly, Halligan was also in charge of managing Hwang's personal tax obligations, which was a central driver for the Plan's creation and the reckless and fraudulent trading scheme that imploded the firm.  During the 2020-21 period at issue, Halligan worked to maximize Hwang's tax position to the detriment of the Plan and its participants, including Sullivan, and to do so lied to Sullivan and other employees about the Plan's positions and the intentions concerning those positions.

76.     Halligan also served as treasurer for the Foundation, and was central to the intermingling of assets, shares, and monies through which Hwang set the Foundation up as the "escape pod" he described to others at the firm.  Halligan knew as CFO that these actions misappropriated deferred compensation that the employees had contributed to the Plan and not only permitted and facilitated it, but covered it up from employees as well.

77.     Becker served as Archegos Chief Risk Officer and was in-charge of managing Archegos's market exposure and risk for Hwang and participants of the Plan, including Sullivan. Along with Halligan, Becker managed back-office functions and operations at Archegos and grew to become one of the primary points of contact Archegos had with its prime brokers.  Further, Becker reported directly to Halligan, and oversaw an operations team that booked trades and interacted with Archegos's fund administrator and auditors.  Importantly, Becker, at the direction of Halligan and Hwang, regularly interfaced with the prime brokers, discussing the addition of trading capital, Archegos' portfolio and investments, its risk profile, and its ability to liquidate. Becker also managed Archegos' cash equity positions, and circulated to Hwang and others internally a daily report that tracked Archegos' cash equity positions in each issuer it held relative

to the issuer's outstanding shares, to ensure that Archegos never exceeded the 5% beneficial ownership disclosure threshold.

78.     Becker actively facilitated Hwang's scheme in the 2020-21 period at issue by lying to prime brokers and employees, and endorsing by their silence and actions the lies of Hwang and the other Executive Defendants for which he had fiduciary and other duties to dispute, about the firm's positions, liquidity, cash on hand, the existence of hedges and reserves, the risk profile, and the plan for managing risk and capturing gains as well as endorsing and covering for other lies on the same topics by Hwang and the other Executive Defendants.

### D.     Archegos' Deferred Compensation Plan.

79.     Hwang's megalomaniacal need to take all credit and see himself as the proper object of employee gratitude led him to chronically attempt to underpay employees and avoid actually delivering to them what they were purportedly paid.  One central mechanism for doing this was the Plan.  Hwang realized that forcing his employees to reinvest millions of dollars into the Fund through the Plan was a *de facto* interest free loan through which he retained investment control over monies he purported to be paying the employees.  This was critical to Hwang because his trading strategy was highly leveraged, with maximum borrowing, and he intended to use that employee compensation as collateral for that margin borrowing.

### 1.     The Plan Launch and Fraudulent Pressure Campaign.

80.     The Plan was formed in 2016.  In October or November 2016, Hwang and the Executive Defendants called a firm meeting to induce employees to participate in the Plan.   Pae and Mills led this meeting with a "select group" of Archegos employees and informed them of the "opportunity" to participate in the Plan.  At this meeting, the selected employees were told they

were the firm's "Key" employees, and that the Plan would only be available to them.[1]   The meeting

included approximately 21 of 27 full-time Archegos employees, representing a majority, including

Sullivan, who was an investment analyst at the time.

81.    The initial "offer" was for these employees to contribute 15% of their bonuses to

the Plan.  Participants could redeem their Plan interests at the sooner of four years or the date of

his or her employment separation.  Although called a "voluntary" Plan, Pae and Mills made clear

in the presentation that these "Key" employees were expected to participate, as a sign of their

loyalty to Hwang by "invest[ing] back into the Fund, invest[ing] in Bill" and having "ownership"

in the firm.  Pae and Mills also told the group that for the Plan to launch there was a minimum

threshold of overall employee participation and 100% participation from the "Key" employees. In

the context of Archegos' culture, this message was understood by all as a directive.

82.    Sullivan was continually told to "trust in Bill" and that the careful management of

the Plan was of critical importance to Hwang.  Each Executive Defendant and Hwang told Sullivan

from time to time that the Plan was a means for Hwang to be generous to his employees, a way for

him to look out for them, and that he took the responsibility of managing their money very

seriously.

83.    Pae and Mills also repeatedly represented that employee-contributed "principal

w[ould] be protected," that "the investment is only upside" and that there was "no downside risk."

Pae, Mills, and Hwang promised that Sullivan's deferred amount could only grow, and that even

if the Fund underperformed one year Sullivan's deferred amount plus any growth through the prior

calendar year would be retained. These oral promises were also reflected in written

communications and the Plan contracts.  In 2016 and 2017, the Plan specified that Sullivan's

---

[1] The 21 employees offered to participate in the Plan in 2016 were: the CFO, the co-CEO, the two co-presidents, the CCO, head trader, the COO, 2 traders, 4 accountants, the office manager, 7 investment analysts.

deferred amount would increase "by the percentage that the Invested Capital of Archegos Fund, LP ("Fund") has increased in value during that year; provided however that if the Fund's Invested Capital declines in value in any calendar year, the amount of the Deferred Payment will **remain the same as at the end of the prior calendar year**." (emphasis in original). The email from Pae is incorporated by reference. This safeguard was a critical element of Sullivan's decision participate in the Plan.

84.     Employees were also told that after several years of participating in the Plan, those who were promised portfolio management opportunities, via a Fund-of-One, would be able to transfer their Plan contributions to their Fund-of-One and manage it themselves.  Promises like this, primarily from Hwang, Pae, Jones, Mills, and Halligan, were especially important to Sullivan and other analysts who joined Archegos based in large part on those Defendants' promises of asset management.

85.     After this initial meeting, the eligible employees were sent an email requesting that they elect to enter the Plan as soon as possible, even before seeing the Plan documents. Sullivan felt enormous pressure to accede to his employers' wishes, and ultimately joined the Plan. Many "Key" employees in 2016 felt similarly pressured.  The meeting and follow-up email resulted in all of the employees the Executive Defendants had selected as "eligible" deciding to join the Plan.

### 2.     The Plan's Illusory "Voluntary" Operation.

86.     Once the employees were in the Plan—which at the time carried only a mandatory deferral—they were presumed to be participating each year thereafter without an opportunity to opt out.  Eventually, Hwang and the Executive Defendants would expand the Plan's mandatory deferral to cover every Archegos employee.  Each year, the Plan got larger, and the deferral amounts increased.  In 2017, the mandatory deferral amount increased from 15% to 25%, and the

deferral term increased from four to five years.  Eventually, the Plan required all employees to participate, including the non-investment and administrative staff, and every employee receiving a bonus had 25% "deferred" back into the Fund.

87.    In 2018, Archegos expanded the Plan to include a "voluntary" additional deferral option for certain "Key" employees which allowed them to "elect" an additional 25% of their total bonus to the Plan.[2]   At the time Archegos established the "elective" portion of the Plan, the Defendants' goal was to capture as many employees as possible in the Plan, regardless of the employees' responsibilities, and maximize the amount each participant was deferring and consequently reinvesting back into the Fund.  Over time, the group of "Knowledgeable" employees would grow to encompass a significant portion of Archegos' employees.

88.    Concurrent to the expansion of the Plan to include the "elective" deferrals, the Executive Defendants, including at least Pae, Hwang, Mills, attempted to remove the safeguard provision of the Plan entirely, but rather settled on stripping the provision down.  From 2018 on, the Plan had "a floor to the original grant value (i.e., even with all the market volatility, the payout amount at the end of the deferred bonus period will never fall below the original grant amount)."  Later in the same email, Pae informed employees that additional language was being added to the Plan, including "[i]f the Fund's Invested Capital has declined from the original grant value at the end of the deferral period, the Deferred Payment will remain the same as the original grant value."  This was a drastic change from the 2016 and 2017 Plan terms which protected Sullivan's deferred amount from dropping below the growth attained in the prior calendar year.

89.    It was made clear to the "Knowledgeable" employees that their compensation and professional standing in the firm depended on maximizing their Plan contributions. If employees

---

[2] At this time the employees Archegos previously labelled "Key" employees were now being called "knowledgeable" employees by Archegos.

hesitated, or failed to immediately re-enroll in the elective deferral portion of the Plan, they received constant reminder emails, usually from Pae, stating that they were one of the remaining few employees who had not yet elected to re-enroll at the maximum amount.  If an employee still failed to maximize their contribution, they would be subjected to an inquisition by the Executive Defendants. When enrollment reached 100% of eligible employees (as it did every year), another firm-wide email was sent congratulating the firm on getting everyone on board.

90.     The pressure to participate in the Plan and defer the maximum amount was imposed by Archegos and each of the Executive Defendants.  For example, in 2019 Jones pressured an analyst into deferring the maximum amount, telling him it would be wise to defer the maximum amount to stay in the firm's good graces.  In the same year, Pae also pressured the same analyst, telling him he should defer the maximum amount if he knew what was good "for his career."  Even the way that Archegos and the Executive Defendants structured the compensation schedule exerted pressure on Sullivan and the employees to max out their deferred amount to avoid being "dinged" by Pae and Hwang for not fully participating.  Each year Sullivan and the other Plan participants had to elect the amount that they would defer from their bonus in November, but their bonus total amounts were not finalized and communicated to them until mid-December, allowing Archegos and the Executive Defendants ample time and opportunity to penalize anyone who did not elect to defer the maximum.

91.     In one year when Sullivan was considering not deferring the maximum amount to save for a down payment for a home, Pae tracked him down to confirm he would be deferring the maximum. In that conversation she forebodingly reminded him that bonus amounts were still being decided upon. The systemic pressure to elect the maximum amount exerted by each of the Executive Defendants in one-on-one conversations with the Plan participants permeated through

the Archegos' employee base.  Sullivan knew that he was expected to elect the maximum amount

if he wanted to be considered a "good follower."  The only way the Executive Defendants would

allow an employee to defer less than the maximum amount without giving them trouble is if that

employee could explain a good enough reason to the Executive Defendants.  One year an employee

was struggling to sell his home and needed a larger percentage of his expected bonus in cash.  He

was forced to explain to the Executive Defendants why he was electing to defer a lower amount

and had to receive their blessing to do so to avoid receiving a smaller bonus. Sullivan was in

constant communication with his colleagues, and the amount of deferral was a frequent subject of

conversation in November of each year. The messaging from Archegos and the Executive

Defendants that the maximum amount must be deferred infiltrated the culture so much so that even

other employees advocated to each other to defer the maximum to avoid retribution. In November

2020, Sullivan reached out to a fellow analyst to ask if he was maxing out his deferred, and the

analyst responded, "Yup. [Another employee] told me if not they d[]ing you hard. So I figured I

[h]ave to. Even though I tool [*sic*] a beating this year w baby moving apartment etf. [*sic*]. But

management knows that – we were on sabbatical."

92.     In 2019, the Plan was expanded again with the "elective" deferral increased to 35%.

Therefore, each year the majority of Archegos employees were expected to contribute 60% of their

total bonus compensation to the Plan and understood doing so was effectively mandatory.

93.     Archegos, Hwang, and the Executive Defendants had full discretion over the Plan

and how the employees' deferred compensation was managed and invested.  The Plan assets were

comingled with the Fund, and neither Sullivan nor the other Plan participants truly had the ability

to dictate how their deferred amounts were invested.  Sullivan and the other Plan participants had

no opportunity or power to meaningfully negotiate the terms of the Plan.  For 2016 and 2017, none

of the participating employees even had the ability to review the terms of the Plan prior to opting in.  In these first two years, the Plan documents consisted of a Bonus Award Confirmation Letter ("Mandatory Plan Contract") which described the terms and conditions of the Plan. Sullivan's 2016 and 2017 Bonus Award Confirmation Letters are incorporated by reference.

94.     Beginning in 2018, two contracts governed the Plan.  First, each employee received a Mandatory Plan Contract, as they had in previous years.  Additionally, each "Knowledgeable" employee received an annual Archegos Capital Management, LP Elective Deferred Bonus Plan for Knowledgeable Employees (the "Elective Plan Contract," and together with the Mandatory Plan Contract, the "Plan Contracts").  For each year, the Plan Contracts were effectively contracts of adhesion, as they were issued without any employee contribution and were considered executed upon receipt of the bonus. Sullivan's 2018, 2019, and 2020 Bonus Award Confirmation Letters are incorporate by reference.

95.     The Plan Contracts were issued at the end of each calendar year in 2016, 2017, 2018, 2019, and 2020.  The Mandatory Plan Contracts detailed the amount of the total bonus award, the amount of the mandatory deferred payment, and how the Plan functioned.  Except as described below, each of the annual Mandatory Plan Contracts had the same material terms, provisions, and conditions.  The Elective Plan Contracts were issued at the end of calendar year 2018, 2019, and 2020.  The Elective Plan Contracts were to be effective for the calendar year following the bonus award.  Except as described below, each of the Elective Plan Contracts had the same material terms, provisions, and conditions. The 2018, 2019, and 2020 Elective Plan Contracts are incorporated by reference.

(a)     The Mandatory Plan Contract.

96.     The Mandatory Plan Contracts dictated that a portion of the employee's total bonus compensation – 15% in 2016 and 25% in all subsequent years – was to be paid to the employee in

cash 30 days following either the end of a specific deferral period or the date of termination of the employee's employment with Archegos.  In 2016, the deferral period was four years, and in all subsequent years it was five years.

97.    The 2016 and 2017 Mandatory Plan Contracts dictated that at the end of each calendar year, Archegos would increase the amount of the Deferred Payment by the percentage that the Fund had increased in value during that year.  However, Archegos also claimed to be providing employees with a guarantee that they would not suffer any losses.  The 2016 and 2017, Mandatory Plan Contracts explicitly stated that Sullivan's deferred amount would increase "by the percentage that the Invested Capital of Archegos Fund, LP ("Fund") has increased in value during that year; provided however that if the Fund's Invested Capital declines in value in any calendar year, the amount of the Deferred Payment will **remain the same as at the end of the prior calendar year**." (emphasis in original).  Each year after that, the Mandatory Plan Contracts guaranteed that the value of those Deferred Payments would never dip below the original amount of the employee's bonus award.  Thus, even if the Fund were to underperform, Sullivan would not be at risk of losing any of the principal of his 2016 to 2020 Deferred Amounts and would not lose any increase in value that those 2016 and 2017 Deferred Amounts had accrued in previous calendar years.

98.    The 2018, 2019, and 2020 Mandatory Plan Contracts dictated that at the end of each calendar year, the Deferred Payment would be increased by the percentage that the Fund had increased or decreased in value that calendar year.  However, the Mandatory Plan Contracts provided that if "due to your termination of employment with the Company, the Deferred Payment becomes payable before this year-end adjustment is made for the calendar year in which such termination occurs, the Company will increase or decrease the amount of the Deferred Payment

by the percentage that the [Plan] has increased or decreased in value during such calendar year **at the month-end most recently preceding your separation**."  (emphasis added).

99.      Per the terms of these Mandatory Plan Contracts, when Sullivan left Archegos, he was entitled to receive the full value of his original 2016, 2017, 2018, 2019, and 2020 mandatorily Deferred Amount plus any increase in value to those mandatorily Deferred Amount up and until the end of the calendar month prior to his resignation.  Thus, even if the employee left Archegos when the Fund was entirely defunct, the employee was entitled to the value of his mandatory Deferred Account from the end of the month prior to his separation.  For Sullivan, this means he is entitled to at least the value of his mandatory Deferred Account as of February 28, 2021.

(b)      <u>The Elective Plan Contract.</u>

100.      Running parallel to and incorporated into the Mandatory Plan Contracts were the contemporaneous Elective Plan Contracts, which governed the "elective" Deferred Bonus Payments for the employees' 2018, 2019, and 2020 year-end bonuses.

101.      Each year from 2018 to 2020, Archegos would issue the Elective Plan Contract. The Elective Plan Contracts would be deemed effective January 1st of the year following the bonus award.

102.      All material terms and provisions in the Elective Plan Contract remained the same from 2018 to 2020.  The only difference being that for the 2018 Elective Plan Contract the maximum allowed "elective" deferral was 25%, and for 2019 and 2020 it was 35%.[3]

---

[3] Section 3.2(e) was not in the 2018 Elective Plan Contract and was added in 2019, otherwise all material terms, provisions, and defined terms are identical in the 2018, 2019, and 2020 contracts.

103.    Under Section 3.2(d) of the Elective Plan Contract, the value of the Deferral

Account[4] or Individual Plan Account is determined based on the value of the Deferred Amounts

and the percentage that the Fund has increased or decreased in value as of the last date of the

preceding calendar month.

104.    Pursuant to Section 4.1 of the Elective Plan Contract, Sullivan was to receive the

distribution of the full value of his elective Deferral Account on the earlier of five years from the

year the election was made or the full value of his elective Deferral Account on the date of his

separation of service.  The payment was to be made in a lump sum and paid no more than 60 days

from the date of Sullivan's separation.

105.    Pursuant to Section 3.2(d) the value of Sullivan's elective Deferral Account on the

date of his separation from service was the value the account had on February 28, 2021.

**E.    Sullivan Participated in The Plan.**

106.    Based on the pressure to participate in, and representations made about the Plan,

Sullivan participated in 2016, 2017, 2018, 2019, and 2020.  In the course of this participation,

Sullivan entered into multiple contracts which governed the Plan. Sullivan entered into the

Mandatory Plan Contracts in 2016, 2017, 2018, 2019, and 2020, and the corollary Elective Plan

Contracts in 2018, 2019, and 2020.

107.    Per the terms of the 2016 Mandatory Plan Contract, 15% ($247,500) of Sullivan's

2016 bonus compensation was mandatorily deferred into the Fund.  Per the 2016 Mandatory Plan

Contract, this deferred payment and its increase was to be paid out to Sullivan the earlier of four

years later – at the end of the 2020 calendar year – or the date of his termination of employment at

---

[4] The "Deferral Account" is "the account maintained to reflect a Knowledgeable Employee's Deferrals made"
pursuant to the Elective Plan Contract. The Deferral Account is the same as the Sullivan's "Individual Plan
Account" which includes Sullivan's amounts deferred under both the Mandatory and Elective Plan Contracts.

Archegos.  Notably, Sullivan was never paid out his 2016 Deferred Payment or its associated increase at the end of calendar year 2020. Rather, he was pressured by Pae and Mills to defer the receipt of this payment another year and wait until 2021 to receive the payment and increase.

108.    Per the terms of the 2017 Mandatory Plan Contract, 25% ($450,000) of Sullivan's 2017 bonus compensation was mandatorily deferred back into the Fund.  Per the 2017 Mandatory Plan Contract, this deferred payment – along with any increase – was to be paid out to Sullivan the earlier of five years or the date of his termination of employment at Archegos.

109.    In addition to the Mandatory Plan Contracts, Sullivan entered into the Elective Plan Contracts in 2018, 2019, and 2020.  Per the terms of the 2018 Mandatory Contract, 25% ($418,750) of Sullivan's 2018 bonus compensation was mandatorily deferred into the Fund. Sullivan "elected" per the terms of the 2019 Elective Plan Contract to defer an additional 25% ($418,750).  In total, 50% ($837,500) of Sullivan's 2018 bonus compensation was deferred into the Fund, to be paid out to Sullivan– along with any increase – the earlier of five years or the date of his termination of employment at Archegos, the total value of which would be measured from the last date of the calendar month prior to termination.

110.    Per the terms of the 2019 Mandatory Plan Contract, 25% ($456,250), of Sullivan's 2019 bonus compensation was mandatorily deferred into the Fund.  Sullivan "elected" to defer an additional 35% ($638,750).  In total, 60% ($1,095,000) of Sullivan's total 2019 bonus compensation was deferred into the Fund, be paid out to Sullivan – along with any increase – the earlier of five years or the date of his termination of employment at Archegos, the total value of which would be measured from the last date of the calendar month prior to termination.

111.    Per the terms of the 2020 Mandatory Plan Contract, 25% ($475,000) of Sullivan's 2020 bonus compensation was mandatorily deferred into the Fund. Sullivan "elected" per the terms

of the 2021 Elective Deferral Contract to defer an additional 35% ($665,000).  In total, 60% ($1,140,000) of Sullivan's total 2020 bonus compensation was deferred into the Fund, to be paid out to Sullivan – along with any increase – the earlier of five years or the date of his termination of employment at Archegos, the total value of which would be measured from the last date of the calendar month prior to termination.

112.    Under the 2016 Plan Contract, Sullivan was entitled to collect his 2016 deferred compensation at the end of 2020.  However, in 2019, Pae and Mills pressured Sullivan to not collect this 2016 total, and instead leave it in the plan for another year.  Sullivan and others were told that deferring this payment for another year would only benefit the employee more, and that it was an important demonstration of trust and loyalty in Hwang to defer.

113.    Sullivan resigned from Defendant Archegos on March 30, 2021 which terminated his employment without "cause" as defined in the Mandatory Plan Contracts and Elective Plan Contracts.  Therefore, Sullivan was entitled to the full value of his Individual Plan Account as of February 28, 2021.

114.    The total value of the Deferred Bonus Payment accounts to which Sullivan is entitled by contract upon his departure was between approximately $31,000,000 to $50,000,000. As of the date of this filing, Sullivan has received no payment of any kind from Defendants Archegos, let alone the up to $50,000,000 to which he is entitled by contract.[5]

F.    The Plan is an ERISA Plan.

115.    The Plan, as established in 2016, is an employee deferred compensation plan, fund, or program offered by Sullivans' employer, Archegos.  The Plan is a plan, fund, or program which

---

[5] The amount claimed here is the minimum to which Sullivan is entitled. If through discovery it becomes clear that the accounts had a higher value on February 28, 2021, Sullivan is entitled to the total value of his accounts as of that date.

was established by Archegos, the Sullivans' employer, which resulted in the deferral of income by the employees for periods extending to the termination of covered employment, bringing the plan within ERISA's control.

116.    Each year, beginning in 2016 the Plan required the mandatory deferral of 15% to 25% of all employees' bonus compensation into the Archegos Fund, and from 2018 on allowed for up to 60% deferral of the majority of employees' bonus compensation.

117.    The Plan Contracts make clear that a portion of the bonus will be paid in cash and the remaining amount will be mandatorily deferred to be paid out the sooner of five years or the employee's separation from employment with Archegos.

118.    The Plan, as established in 2016, was a continuous administrative scheme or plan, which had substantially the same material terms and provisions even as the contributions increased over time.  The deferred compensation payments were siloed into Individual Plan Accounts, and Sullivan and other Archegos employees were able to view on the EWM Global Plan Administration site the value of their Individual Plan Accounts broken down by year.  All deferred compensation payments were contributed to the Archegos Main Fund and comingled with the Fund assets.

119.    The elective deferral portion of the Plan, which was introduced in 2018, is a part of the same ongoing administrative scheme or plan.  The elective deferral option was a continuation of the Plan as already established.  It merely intended to give the same "Key" 20 or so employees who were a part of the Plan since 2016 the option of deferring larger amounts into the Plan.

120.    During the first year of the Plan at the end of 2016 it was offered to over 74% of Archegos employees.  Eventually, the Plan was offered to all employees.  Even the elective deferral portion of the Plan which was purportedly only offered to "Key" employees was in fact offered to

up to 21 individuals.  Archegos throughout the life of the Plan had no more than 50 employees.  Therefore, even the allegedly limited "elective" deferral portion of the Plan was offered to no less than 44% of total employees.

121.    The Plan was offered to all employees regardless of position, managerial responsibilities, income level, or ability to negotiate the terms of the Plan and defend their interests.  The Plan was mandatory for all Archegos employees.  The elective deferral portion of the Plan was offered to analysts, traders, accountants, and administrative employees.

122.    Not only were the employees pressured to participate in the Plan, but some years the employees were not even allowed to review the Plan documents prior to joining. Moreover, the employees were mandated to contribute at least 25% of their bonus payments to the Archegos Fund, without any ability to negotiate a lower amount.

123.    Even the allegedly "elective" portion of the contributions were not "elective" because the so called "knowledgeable employees" were subject to extreme pressure and intimidation into electing the full amount allowable under the "elective contributions." Sullivan was subjected to extreme pressure and suffered fear of retribution from Archegos and the Executive Defendants, such as receiving a smaller bonus award and falling out of favor as a "good follower." Sullivan was expected to contribute the maximum amount unless he could articulate a specific reason why he could not contribute the full amount, such as a specific financial hardship.  Sullivan was not informed of the total amount of his bonus until he had elected what percentage would be deferred as part of their "elective" deferral.  Sullivan feared that the amount of his overall award would be adversely affected if he did not contribute the maximum amount.  The efficacy of this pressure is demonstrated by the fact that Sullivan elected the maximum contribution available each year.

### G.   Archegos' Grace and Mercy Alter Ego.

124.   The Foundation was created in 2006 by Hwang and his wife to siphon assets from Tiger Asia, shelter them from taxes and creditors, and establish a fallback asset management position in the event his other funds failed, which allowed him to take even more grandiose investment risks.   Since its inception, the Foundation distributed millions of dollars in grants to dozens of primarily religious-affiliated institutions and nonprofits.   However, these grants were merely to create the guise of a legitimate charitable organization when, in fact, it served as an alternative fund for Hwang, his family members, and "good followers" to fall back on and otherwise manipulate for their own benefit via self-dealing and positions provided as rewards and incentives.   In recent years, tax records show that the Foundation has only donated between $10-24 million a year, despite receiving and holding hundreds of millions, far below what Mills and Hwang would lecture employees was their Biblical duty to tithe.

125.   Although those donations account for a large amount of money, they are in reality only a small piece of the Foundation's assets.   Upon information and belief, the Foundation held more than $800 million in assets as of March 26, 2021.   These assets were accumulated through Hwang's transfer of stocks to the Foundation, including hundreds of millions of dollars in shares of companies like Netflix, Amazon, Facebook, Expedia, and Hawaiian Airlines, to the Foundation.   Within days of receiving these shares, the Foundation sold them and reaped the profits.   These share transfers to the Foundation were all coming from the Archegos Fund, which included employee deferred compensation in the Plan, which was done without the knowledge or consent of employees.

### H.   The Foundation and Archegos Were Functionally Indistinguishable.

126.   Despite being portrayed to the outside world as a charitable organization, the Foundation is, in reality, little more than an arm of Archegos which exercises complete domination

over the Foundation.  First, Archegos and the Foundation are run by the same people.  Throughout Archegos' existence, Hwang and the Executive Defendants (as well as many other Archegos employees) all had either formal titles at both organizations or performed the same executive functions at each.  Archegos and the Foundation were treated and run as one unified entity.

127.    Second, Archegos and the Foundation employees shared benefit systems, including a unified 401k and Profit-Sharing programs.[6]  In connection with these shared benefit programs, employees of Archegos and the Foundation were constantly included together in group emails.

128.    Third, both entities shared office space at 888 Seventh Avenue in Manhattan. Within the offices, there was no separation between Archegos and Foundation employees, as they shared the workspace.  Hwang and the Executive Defendants often held "firmwide" meetings, both in person and via Zoom, which included employees from Archegos and the Foundation, with everyone treated as working for the same entity.  In fact, in 2019, Archegos, Hwang, and the Executive Defendants added a new floor to the office space for the Foundation because they were advised internally that it "did not look good" to be intermingled on the same floor of the office building.    Nevertheless, this act merely masked the otherwise complete domination and intermingling of the two entities

129.    Fourth, both Archegos and the Foundation shared overlapping operations that reveal their interdependency.  The same accounting, trading, compliance, and back-office staff, ostensibly Archegos employees, performed these same functions at the Foundation.  In fact, there were no investment research analysts at the Foundation.  The research for the Foundation equity positions was generated by Archegos analysts.

---

[6] The 401k and Profit-Sharing programs were not part of the Plan.

130.    Fifth, Archegos and the Foundation had merged online calendars.  Archegos and Foundation employees all went to Hwang's retreats as a unified group, with no separation between the two.

131.    Sixth, many Archegos employees had parallel or related titles at the Foundation, including Christopher McPadden, who was Co-President of the Foundation and also a Senior Advisor at Archegos.  The other Foundation executive was Sumi Kim, whose husband was a long-time consultant to Archegos.  Further, most of the Executive Defendants held a formal title at the Foundation.  Even employees who did not have a formal role with the Foundation were still forced to do work on its behalf.  All Archegos employees were mandated to be a liaison for one of the Foundation's grantees.  Archegos employees were further pressured to donate personal funds to the grantees.  Every year around bonus time, Mills would lecture Archegos employees about the need to give back and be generous, which occurred simultaneously with Pae telling employees why they will likely make less money than expected, which was known at the firm as "the annual guide-down."

132.    Seventh, information was regularly shared between Archegos and the Foundation. When Archegos employees discovered research and investment analytics related to a Foundation investment, the information was quickly shared with the Foundation, despite the lack of any legal reason or basis for doing so and an obvious commercial reason not to do so were they truly separate investment entities.    Specifically, Christopher McPadden was included on the Archegos investment team email distribution list, received all investment memoranda sent from Archegos investment staff, and joined investment-related meetings and calls.  McPadden would often acknowledge receipt of these memorandums and provide commentary, often on topics that had no connection to his role at the Foundation or Archegos.

133.     Hwang also utilized work performed by Archegos employees to directly benefit the Foundation, often asking Archegos analysts about specific stocks that were "big positions" for the Foundation.  For example, on or about October 25, 2018, Hwang emailed an Archegos analyst to inform him that based on an investment memorandum the analyst prepared for Archegos, Hwang had purchased shares of the same security for the Foundation.   On another occasion, Hwang thanked this analyst for his work and told him "I'm buying some shares for the Foundation," using the analyst's work to bolster the Foundation's funds.  Hwang further noted that he purchased shares of another company the analyst recommended, Blackstone, Inc, for the Foundation as well, telling the analyst "[s]ince the foundation essentially does not pay any taxes, the dividend income from [Blackstone] is very attractive."

134.     Eighth, on numerous occasions over many years at Archegos, Hwang made it known to employees that if he or the firm ran into trouble, Hwang would simply move to the Foundation full time and continue his investment business largely unabated.  One example was in December 2018, when the portfolio lost 35% of its value.  That same month, Hwang told employees that he was not worried about the portfolio decline, because if Archegos ever ran out of funds, he would always have the Foundation and would just continue to operate there, and that select "loyal" employees and "good followers" would always be able to join him.  Hwang repeated these statements at the firm's retreats—which were shared with the Foundation—in 2018 and 2019, when he again told employees that the Foundation was his "fallback plan" and if anything ever happened to Archegos, he would be fine and would continue investing through the Foundation.

135.     The entirely co-mingled and overlapping relationship between Archegos and the Foundation, Hwang explicit acknowledgment that he viewed them as indistinguishable, and his

operation of the Foundation so it could serve as an "escape pod" in the event the firm failed plainly exhibit that Hwang ran the Foundation as an alter ego designed to shelter assets for himself, his family, and "good followers" away from creditors of a future failed Archegos. Indeed, that is exactly how he repeatedly and explicitly described it. These funds necessarily included percentages of employee deferred compensation and likewise insulated those employee creditors from those funds in the event Archegos failed and never paid employees what they were owed. And, in fact, as set forth below, Hwang and the Executive Defendants and others used the Foundation for exactly this purpose when Archegos failed.

136.    The Foundation in fact served as an "escape pod" after the demise of Archegos.

## III.    Archegos' Initial Highly Leveraged Liquidity-Focused Investment Strategy.

137.    Initially, Hwang's investment strategy at Archegos was investing in large cap, highly liquid securities that would grow with a rising stock market, such as Facebook, Amazon, Apple, Netflix, Alphabet, Microsoft, Expedia, Texas Capital Bank, Wells Fargo, American Express, First Data, and Fiserv.  To generate above market returns with this strategy, Hwang used substantial "leverage" in the form of money borrowed on margin from large prime brokers and used it to take larger trading positions and multiply returns with borrowed money.  For example, although Archegos held assets worth approximately $35 billion, it utilized leverage and related swap transactions to trade positions worth more than $150 billion at its peak.

138.    While highly leveraged trading strategies amplify positive returns, they also can pose substantial risk if a stock experiences volatile swings, the prime brokers call the margin loans, and the stock collapses as the trader attempts to liquidate the position to meet the margin calls. Hwang's liquidity-focused trading strategy minimized these risks because these stocks were highly liquid with heavy daily trading volume so that a dramatic stock drop was not likely to be caused by Archegos liquidating its entire large positions.  Hwang had told his employees  that one of the

benefits of his focus on liquidity was risk management and the ability to change his mind if the thesis or market conditions changed.

139.    The prime brokers provided leverage to Archegos to earn substantial fees and interest.  Indeed, margin trading services was a substantial revenue source for these banks, and Archegos generated as much as $100 million in prime broker fees annually.  This made Archegos one of the most sought-after prime broker clients on Wall Street.

140.    In addition to providing leverage to Hwang and Archegos, many of the prime broker institutions were otherwise counterparties for Archegos' trading transactions, particularly with respect to swap agreements.  Swap agreements are financial instruments in which the underlying securities are held by and in the name of the prime brokers.  The client—here Archegos—directs the purchase and sale of the shares, which are executed by the prime brokers.  However, the client ultimately obtains the benefit (or bears the responsibility) for any gains or losses in the shares.  In exchange for this service, the prime broker collects a fee for holding the shares, and the client provides collateral to secure the agreement.

141.    Hwang was a heavy user of the less common "bullet" swaps, which carry terms of greater than one year, and do not periodically reset based on market values.  Because of their longer terms and lack of interim resetting, bullet swaps present a greater risk and potential reward than standard swaps.  This risk was compounded in heavily leveraged positions because the extended, fixed terms of "Bullet Swaps" left little flexibility in the event of a liquidity event.  Hwang's use of bullet swaps in combination with his highly leveraged and illiquid positions was a departure from prudent asset management, which would have dictated using more traditional swaps to hedge the risk of the position's leverage, not aggravate it. They were also inconsistent with the representations used to induce employees and Sullivan to participate in the Plan.

142.    On the other hand, and of particular importance to Hwang, "Bullet Swaps" provided the advantage of fewer potential taxable "events" during the swap period than was the case with standard swaps which had market reset functions.  This limited tax impact was important to Hwang, who was almost psychologically incapable of executing trades that would result in loss of capital to taxes.  Indeed, as would become clear after Archegos' collapse, Hwang's aversion to taxable events led him to maintain and even press unsustainable trading positions that any prudent manager would have closed.

143.    Hwang's highly leveraged, liquidity-focused investment strategy was very successful over the term of the firm's first several years, with the portfolio growing from approximately $500 million in 2013 to nearly $5 billion in 2019.

## IV.    Hwang's Drastic COVID Pandemic Investment Changes.

144.    As the COVID-19 pandemic spread worldwide in early 2020, international financial markets were gripped by deep uncertainty.  Between February 12 and March 23, 2020, the Dow Jones Industrial Average lost 37% of its value.  Archegos' funds, including the Plan, were down more than 70% during the same time period even through their positions were relatively high quality, highly liquid securities.

145.    Despite this uncertainty and Archegos' substantial losses, Hwang was emotionally incapable of accepting that his fantastic run of oversized returns might need to pause.  Instead, Hwang adopted a far riskier strategy of buying huge, leverage fueled, positions in much smaller market cap stocks with limited trading liquidity.  These stocks included, Viacom/CBS, Discovery Communications, and a variety of Chinese internet stocks, including Baidu, IQIYI, Inc. VipShop Holdings, Tencent Music, and GSX.  Hwang expected that heavily leveraged trading in these smaller, and much less liquid, stocks with high short interest would drive their prices up even in a

pandemic.  This would at least create substantial profits for Archegos and Hwang and allow him to borrow even more money.

146.    Hwang's dramatic shift in trading strategy exponentially increased the firm's risk profile in a manner completely inconsistent with the representations used to induce employees, including Sullivan, to participate in the Plan.  Gone was the highly liquid portfolio of higher quality stocks that had greatly mitigated the risk of employing maximum leverage.  Hwang now had no room for volatility or losses but would need to keep driving the price up with more and more buying.  This would not be sustainable indefinitely, and any inability to continue buying or unexpected market events could quickly lead to a price collapse, margin calls, and catastrophe. Hwang was betting it on red, letting it ride over and over, and doing so with borrowed money.

147.    Quickly implementing this new strategy, Hwang relentlessly began purchasing the target stocks on an almost daily basis.  One such example was VipShop Holdings, a Chinese e-commerce company.  As of June 30, 2020, Morgan Stanley, one of Archegos' prime brokers, held 5.22 million shares in VipShop for Archegos and by December 31, 2020 it held 44.6 million shares.

### A.    Hwang Fraudulently Conceals the Recklessness of His New Strategy.

148.    Through the fall of 2020, Sullivan and other Archegos employees tried to understand the apparent shifts in Hwang's trading strategy.  Repeatedly, Sullivan inquired of Hwang and the Executive Defendants about the rationale for the ever-increasing positions in illiquid stocks, the amount of gross leverage being utilized, and what was being done to ensure risks were properly managed and mitigated.  These inquiries were initially deflected and then answered with materially false and misleading statements and omission that grossly misrepresented the investment strategy and overall risk profile.

149.    Among other things, Hwang, Mills, Jones, and Pae misrepresented to employees who questioned the new strategy, including Sullivan, that Hwang had not fundamentally changed

trading strategies but was instead simply focusing on different investments with greater potential upside.

150.    However, this ruse could not be sustained indefinitely as Archegos amassed substantial percentages of the outstanding shares in these companies.  Then Hwang and the Executive Defendants, in particular Halligan, Becker, and Mills, throughout this period misrepresented that Hwang's new strategy was akin to "private equity in the public sector," with Hwang attempting to portray himself as an activist investor seeking to accumulate large positions and exert pressure to force changes that would materially unlock substantial value.  But this was a lie.

151.    Hwang had no such plan or intent.  He had no thesis to unlock value at any of these companies, and no research reflecting any such thesis.  The trading was not long-term value investing, but short-term day trading designed to use Archegos' substantial leverage-driven buying power to manipulate the price of these illiquid stocks higher and higher.  Rather, Hwang reveled in these large positions, and gleefully told employees that this trading strategy allowed Archegos to "boss around" the executives of the companies it was investing in.  On a more charitable day, Hwang would say he was influencing these companies in positive ways that reflected his religious ethics.

152.    In fact, unbeknownst to the Plan participants, Hwang's claims were impossible because he accumulated the majority of these massive positions through swap agreements in which Archegos did not even hold those positions in its own name, had no voting rights, and could not meaningfully exert pressure on those companies.  Nor were his positions structured like private equity or activist investors, but instead relied on massive short-term margin leverage that could be pulled on a moment's notice.  Private equity firms borrow at the portfolio company level with

typically ring-fenced debt completely unlike Hwang's fund where a margin call due to one stock's decline could trigger forced sales in the rest of the portfolio.

153.    Nevertheless, throughout the second half of 2020, Hwang, Mills, Pae, Halligan, and Jones constantly repeated the core misrepresentations and mantras that employee Plan principal was "guaranteed" and being managed prudently, and its risk profile had not materially changed because it was well-hedged and backed by substantial cash and liquidity that would avoid catastrophic margin calls.  These were made in individual one-on-one conversations including with Sullivan, which these defendants knew would then be reported back to the other employees, and in firm-wide meetings and discussions.

154.    For example, in December 2020, Pae was questioned about concerns employees had with the Plan, and risks to the Plan assets due to Archegos' volatile positions.  Pae responded that these concerns were overblown, and that the deferred compensation had "lots of unrealized gains." That same month on an investment team Zoom meeting, Hwang, Mills, Pae, Halligan, and Jones made clear to Sullivan and the other employees that Archegos had plenty of cash on hand and hedges to protect their positions, avoid catastrophic margin calls, and preserve employee Plan contributions and returns.   They also reassured the audience that Hwang was acting prudently and would reduce position to preserve their contribution and returns.   Based on these misrepresentations and mantras, Sullivan remained at Archegos through 2020 into 2021.

155.    Hwang and the Executive Defendants fraudulently misrepresented the trading and risk profile to Plan participants for several reasons.  First, Hwang's reckless trading strategy required that Archegos keep adding to its positions to maintain the stock price, and he needed maximum leverage to do so, including the leverage the Plan contributions provided.  If employees began redeeming their Plan balances, Hwang would have had to begin selling down positions to

cover those redemptions, those sales would have likely caused a potentially severe price decline, and the loss of that available leverage and associated price decline could have led to catastrophic margin calls.  Second, mass redemptions and employee departures would have raised eyebrows in the investing community, causing lenders to question the current climate of Archegos, and could alone have caused prime brokers to tighten or call margin loan balances.  Third, Hwang's megalomania could not tolerate the rejection such employee departures would represent.

     **B.**     **Hwang's 2021 Trading Rockets Past Red.**

156.    Despite those fraudulent assurances, Hwang added millions of dollars to these positions every day into the year-end, even those securities that had some liquidity became entirely illiquid for Archegos.  Sullivan and other Archegos employees again confronted Hwang and the Executive Defendants.  Like many fraudulent schemes nearing collapse, Hwang and the Executive Defendants resorted to more aggressive recriminations and wilder misrepresentations about substantial hedges and billions in cash reserves.

157.    For example, in December 2020, at a firm wide meeting, the Head of Quantitative Research Jensen Ko questioned why Hwang was buying the same concentration of risky stocks every day.  Hwang became visibly angry, scolding Jensen and telling him that he was "misinformed" and should "pay attention" and said "it's not everyday Jensen."  Hwang claimed that he bought the stocks only when they went down, and that he was able to trade as he was because the portfolio was "well hedged with a lot of cash on hand."  These were flat-our lies.  The Executive Defendants not only remained silent in the face of these lies and thus implicitly endorsed them when they had a fiduciary duty to speak.  Pae, Mills, Jones, and Halligan did follow-ups with the groups to reinforce and elaborate on these false claims, assuring employees, including Sullivan, that there were multiple layers of hedges and plenty of cash to offset the seemingly increased risk. Hwang also said "you'll notice that we have created baskets with our prime brokers as hedges."

158.     The confidence and seeming sincerity with which these messages were delivered, their corroboration by the statements and silence of the Executive Defendants, and the sheer unbelievable audacity had these claims been lies, caused Sullivan and others to accept the assurances.  For example, two days earlier, on December 7, 2020, one Archegos employee told Sullivan in a text message that Hwang was forcing up the price of one of his favored stocks, to which Sullivan replied, "this is actually really scary."  But on December 11, 2020, two days after Archegos' "plenty of cash on hand" misrepresentation, Sullivan and another analyst were discussing bonuses that would be contributed to the Plan and that analyst explained that Pae told him that that their concerns were overblown and unwarranted as there were "lots of unrealized gains" in the positions and that Hwang intended to hedge and promptly secure those gains through various means. Sullivan was incredulous that Archegos would not simply pay more cash bonuses, rather than forcing them to defer, especially given the fact that Hwang had told him he has $1 billion of cash on hand.  In late December 2020, Pae and Hwang used the alleged success of the Plan and the increase in value of Sullivan's Individual Plan Account to justify underpaying him in his 2020 bonus.  Pae rationalized that "you understand Bill has done really well with the deferred. So take that into account." When discussing the Plan, Sullivan was repeatedly told by the Executive Defendants that Hwang had "created so much wealth" for employees in the Plan, implying that Sullivan needed to be patient and grateful.

159.     Hwang and the Executive Defendants offered even more detailed lies to further induce reliance by Sullivan and other employees.  For example, Hwang had Archegos' prime brokers create series of hedges, called "short baskets," and used the general but non-transparent presence of these purported "short baskets" to mislead Archegos employees that these were hedges

for Archegos' enormous long positions.  But employees were not allowed to see the content or the size of these short baskets, and these positions were not adequately hedged as described.

160.    The short baskets were not the only false hedges Hwang and the Executive Defendants used to mislead employees.  In late 2020 and early 2021, Hwang told Sullivan and other employees that Archegos was going to begin participating in block sales to secure profits and reduce risk.  For a portfolio built on amassing significant positions in a small number of stocks, block sales represented a key hedging strategy to maintain balance and risk.  In block sales, a shareholder works to coordinate the sale of a large block of shares in a single private transaction that will not drive the public price of the shares down in a significant way.

161.    Hwang and the Executive Defendants, including Halligan, Becker, and Mills, began building out this ruse in late October 2020 when Hwang instructed an analyst to contact his former investment bank to line up block sale buyers.  Hwang had no intention of actually pursuing those transactions but directed the analyst knowing it would reassure the analyst and others that Hwang, in fact, was preparing to take down the positions as prudence would require.  Likewise, during firmwide Zoom meetings in November of 2020, Hwang repeatedly told employees, including Sullivans, that he was preparing to take down positions through large block trades.  These representations about pending or anticipated block sales continued through January, February, and March 2021.  In January 2021, an analyst asked Hwang when he would stop adding to positions in the stocks he was buying.  Hwang told the analyst that he was "already there."  Yet, Hwang kept buying.

162.    Hwang continued to make these misrepresentations until the crash.  For example, during a one-on-one conversation in early March 2021, Hwang told Sullivan that he was in the process of de-risking the portfolio.

163.    All these representations were lies.  Hwang never intended to engage in block sales and was merely seeking to deflect and stall employee concerns and departures and permit him to continue adding to these positions recklessly and inexplicably.

164.    Hwang and the Executive Defendants also led Sullivan and others along with personal promises to them.  For example, when a new analyst joined Archegos in 2018, the analyst made clear that a key career goal of his was to independently manage funds.  When he was offered the job, both Jones and Pae expressly told the analyst that he was being hired to support Jones for an upcoming launch of a fund-of-one, which would manage money.  Others like Sullivan had joined the firm for the same reason.  As Hwang and the Executive Defendants, including Halligan, Jones, and Mills, were initially trying to dampen employee concern in late 2020, they made public pronouncements that these fund-of-one opportunities for the analysts were soon to begin.  They would continue to drag these promises out for the rest of the year even though they knew Hwang had no intent of following through on these promises.

165.    For example, on or about August 19, 2020, it was announced in a firm-wide video meeting that Jones and another analyst would soon be managing a fund-of-one, with Hwang noting that "this was an exciting opportunity … that [I] am very supportive of."  A month later, on or about September 23, 2020, Jones told the analyst that they would be given $25 million to begin managing, and that this fund would begin on October 1, 2020.  October 1 came and went and no fund was created.  Over the course of the next several months, Jones and other senior members of the management team repeatedly told the analyst that the fund start would be slightly delayed, but that it was "definitely" happening soon.  Halligan also assured the analyst on several occasions in late fall 2020 that "the fund-of-one will happen soon." All of these claims were an orchestrated

effort to convince that employee and others, like Sullivan watching, that these promised opportunities were imminent.

166.    Sullivan also joined Archegos based on the promise of managing funds.  Beginning in the Summer of 2020, Sullivan began seriously considering leaving Archegos to start his own investment fund.  In planning to launch his own fund, Sullivan sought out Jones in August 2020 for advice on how to plan his exit from Archegos.  Jones told Sullivan that in order to remain on Hwang's good side, Sullivan should stay at Archegos until at least the end of the year.  According to Jones, if Sullivan stayed until then, and then had a discussion with Hwang about leaving to start another fund, Sullivan would be better positioned to manage money with Hwang's blessing and likely Hwang would provide Sullivan with the opportunity himself originally promised.  This was a lie.

167.    Relying on Jones' advice, Sullivan stayed at Archegos through the end of 2020.  In November, during Sullivan's 2020 year-end review with Hwang, Mills, Jones, and Pae, Sullivan was again told that he would be running a fund-of-one soon.  In January 2021, Sullivan again spoke with Jones about this.  Jones again misrepresented to Sullivan that he should stay at Archegos for several more months at which time he would be given the opportunity to manage money.  Jones also assured Sullivan that Hwang was focused on prudently taking down the profits they had amassed.  Around the same time in January 2021, Sullivan was told by Mills that he would soon be allowed to manage his deferred capital in a fund-of-one.  These lies induced Sullivan to remain at Archegos.

168.    Additionally, beginning in January 2021, Sullivan requested a meeting with Hwang to discuss his future at Archegos.  Hwang avoided and delayed this meeting for two months.  Finally, on March 6, 2021 Sullivan met with Hwang.  Sullivan told Hwang he intended to leave

the New York area and relocate his family elsewhere and was prepared to resign from Archegos and call his deferred compensation to purchase a family home.  Hwang immediately and adamantly reiterated that Sullivan would begin managing money in a fund-of-one for Hwang and that Hwang was already into the process of "de-risking" the portfolio and realizing massive gains and that Sullivan should remain to enjoy.  Hwang said that it was in the best interest of Sullivan's family to remain with Archegos, rent a house because Sullivan's capital was tied up with Hwang, and that Sullivan's deferred compensation would be well-protected.  Based on these statements, Sullivan decided to remain at Archegos.

169.    These representations were materially false and misleading as each of these defendants understood that there was no plan to give Sullivan or anyone else a capital management role anytime in the foreseeable future.

## C.    Hwang's Runaway Train Crashes.

170.    By the end of December 2020, the Archegos portfolio was up over 100% for the year to approximately $8 billion and should have been prudently de-leveraged and preserved just as the Defendants had promised to do, their prime brokers were begging them to do, and their employees were expecting them to do.  But Hwang could not psychologically do so because he could not accept that his fund's incredible success would ever be paused or interrupted and wanted to brag about how he made enormous profits when others lost money or were too scared to invest aggressively.  For that reason, despite the Defendants' repeated misrepresentations, there were no remotely adequate hedges, substantial cash reserves, block sales, or other plans to responsibly de-risk the portfolio.  Instead, Hwang completely ignored those promises and any semblance of prudent asset management and in 2021 drove full speed past the point of no return and in March 2021 Archegos went off the cliff.

171.    To continually increase his purchasing power, Hwang needed quick access to new leverage.  He received this through the prime brokers.  By the fall of 2020, Archegos had hit or exceeded its limits with its existing prime brokers and needed additional capital to prop up its Portfolio.

172.    When a prime broker lends to an investor like Archegos, it establishes a potential exposure ("PE"), which is a calculation to assess the maximum potential exposure of the prime broker in the event that the investor defaults.  The PE takes into account, and provides one measure of, the sufficiency of the margins posted by a counterparty.

173.    By the end of January 2021, Archegos' PE with Credit Suisse was *400%* above its limit.  Hwang implemented this same reckless trading strategy across all of its prime brokers, and Archegos was similarly in breach of the risk levels imposed by those lenders as well.  However, most Archegos analysts, including Sullivan, were completely unaware of these breaches.  Instead, they were being told Archegos was well hedged and had plenty of trading cushion.  Furthermore, none of this was disclosed as part of the Plan documentation.

174.    Hwang knew, however, that he could only push his existing brokers to a certain point and needed new sources of leverage to maintain his buying frenzy.  Hwang directed Becker and Halligan to secure additional trading capital.  Becker and Halligan began soliciting additional prime brokers to lend Archegos capital.  During the due diligence process, the prime brokers requested information and assurances about Archegos's risk profile and its key positions.

175.    In furtherance of the scheme, Becker and Halligan, at the direction of Hwang, repeatedly provided misrepresentations to several potential prime brokers, providing them inaccurate information about the size of Archegos's largest positions, and how quickly its portfolio could be liquidated.

176.    For example, Becker repeatedly misrepresented to prime brokers that Archegos's largest single position was only 35% of Archegos's net asset value ("NAV"), or capital.  However, at certain times, including in February 2021 when Becker made this misrepresentation, he knew that Archegos's largest position was more than 65% NAV.  When Halligan and Becker did this he was fully aware that these misrepresentations were also entirely inconsistent with the facts, Hwang, and the other Executive Defendants had continuously fed to the Plan participants and with their fiduciary duties to the Plan participants.  Nevertheless, they continued to make these misrepresentations in furtherance of the fraudulent scheme they were participating in executing on Hwang's behalf.

177.    Beginning in late 2020, Archegos sought out and obtained credit from UBS, Wells Fargo, Bank of America, and Goldman Sachs.  During this time, Archegos also pursued credit from JP Morgan and Citibank.

178.    Archegos' engagement with Goldman Sachs highlights how desperate Hwang and the firm were for capital.  During his time managing Tiger Asia, Hwang had a relationship with Goldman Sachs.  But following his 2012 settlements with the SEC and U.S. Attorney's office, Goldman blacklisted Hwang, and refused to do business with him when he rebranded as Archegos. This treatment caused Hwang to despise Goldman, who he frequently criticized and refused to acknowledge.  However, by Fall 2020, and desperate for additional capital, Hwang had no other choice.  By the end of 2020, Goldman and Archegos executed an investment agreement allowing Archegos to invest on margin with the bank.

179.    Once again, Hwang's short-sighted moves produced brief, but fleeting success. With an additional capital infusion, Hwang was able to quickly increase his returns, but the approach magnified Archegos' risk and further removed the now long-gone safety net of Hwang's

traditional approach to managing risk.  Though Archegos was producing significant returns on paper in late 2020 into 2021, Hwang's approach, supported by the Executive Defendants, created a ticking time bomb that made Archegos susceptible to massive margin calls in the event of a market decline in a particular sector.  Each of the Executive Defendants were fully aware of the inconsistency between what the Plan participants understood and believe based on the misrepresentations they had been fed and the reality of the firm's positions and likewise knew this trading was entirely inconsistent with their fiduciary duties to the Plan.  They nevertheless elected to facilitate Hwang's scheme as they had throughout.

180.    In taking their reckless scheme even further, Hwang and the Executive Defendants knew they would not be able to effectively explain away any more the failure to de-risk as promised.  Accordingly, on January 28, 2021, Hwang and the Executive Defendants cut off employee access to the daily trading activity and positions, which an email from Mills explained only that this was "due to recent market movement" without any specific explanation. This email is incorporated into this Complaint by reference. Each knew this email was a lie but nevertheless did nothing to challenge it because their intent was to reinforce it through their silence and acquiescence despite having fiduciary and other duties to speak out.  Just when Hwang would have been de-risking as promised, he blinded employees from seeing what he actually was doing. Hwang and the Executive Defendants understood they were betraying employees' trust and recklessly gambling their hard-earned money in complete contradiction to the assurances they had repeated provided and their fiduciary duties.  Reflecting how egregious they understood their behavior to be, they installed heightened security systems in Hwang's office and the executive suite to further protect themselves and their scheme from detection.  The security upgrades

included more cameras, panic alarm sirens, and locks for Hwang's office to lock himself in if necessary.

181.    Hwang's refusal to begin de-risking going into 2021 alarmed even his prime brokers, who until now had tolerated his less severe leverage-fueled trading.  By the end of January and beginning of February 2021, prime brokers began asking that additional collateral be  posted for Archegos' margin trading or that it deleverage the portfolio, which is what he and the Executive Defendants had promised employees would be done and lied was being done.  But Hwang, Halligan, Mills, and Jones ignored even the firm's prime brokers, resorting to the same lies they used on employees about substantial cash reserves and hedges at other undisclosed institutions, as well as outright avoidance, to hold off prime broker intervention.  Throughout February and March, prime brokers desperately tried to get Archegos to take the steps necessary to avoid a catastrophe, and throughout Hwang refused.  Instead, he and the Executive Defendants stalled, scheduled and cancelled critical meetings and calls, and lied about the overall portfolio and their intent and efforts to de-risk, while refusing to provide transparency into the overall portfolio positions and reserves.

182.    Defendants Halligan and Becker, in charge of maintaining the prime broker relationships and the requisite margin levels with the prime brokers, utterly neglected their responsibilities, and instead ignored and lied in response to the prime broker requests at Hwang's direction.  They did so knowing full well the firm needed to de-risk urgently, had promised to do so, and almost certainly would implode if it did not.

183.    For example, between January and late March 2021, Becker and Halligan continuously lied to the prime brokers about Archegos' largest positions and how quickly it would take them to liquidate if needed.  Many of these prime brokers required an Archegos representative

to sign acknowledgements and confirmations about the accuracy of the information being provided.  Hwang directed Becker and Halligan to repeatedly sign these documents, knowing full well that the information they provided and were confirming was inaccurate.

184.    Yet up to the very end, no matter how certain collapse became, Halligan and Becker maintained the false narrative to employees.  For example, on March 22, 2021, Halligan misrepresented to an employee that Hwang was about to implement several de-risking strategies when, in fact, he knew none were likely to occur or make a material difference.  Becker did likewise as did the other Executive Defendants as they fed their collective false narrative to the firm concerned employee by concerned employee.

185.    The first domino to fall was ViacomCBS, on March 22, 2021.  Though well-known, ViacomCBS had been going through a number of struggles, and became one of the main securities that Hwang purchased continually through 2020.  By the week of March 22, 2021, it is believed that Archegos owned, directly and indirectly, over $20 billion worth of ViacomCBS shares, making Archegos one of the company's largest beneficial equity holders.  Even more brazen, most analysts, including Sullivan, did not know how large the ViacomCBS stake was.

186.    On March 22, 2021, in an attempt to raise capital for its streaming service, ViacomCBS announced a stock and convertible bond sale worth approximately $3 billion.  This offering caused the company's share price to drop by as much as 9%.  The following day, March 23, 2021, ViacomCBS shares plummeted another 23%.

187.    These steep declines were exactly the type of events that could trigger a catastrophic collapse in a highly leveraged and illiquid position such as Archegos.  And that is exactly what happened.  Archegos's prime brokers began making margin calls that day and by March 24th the position was in free fall.

188.   ViacomCBS was not the only Archegos investment that dropped that week.  On March 24, shares of Tencent Music, a Chinese music streaming service, declined 20%.  Prior to the decline, Archegos had continuously purchased Tencent Music and held billions of dollars' worth of shares in a highly leveraged position.  This too precipitated prime broker demands to sell off the position or post more collateral.  Inexplicably, Hwang refused to heed common sense or the demands of the prime brokers who had the power to pull the plug on his firm.  Hwang flatly refused to sell any of Archegos' positions even though this would have been the most prudent action for the Plan.  One of the reasons he refused to do so was he did not want to trigger taxable events for himself, even though cutting risk would have been to the benefit of the Plan.

189.   Left with no alternative, on March 24 and 25, Archegos' prime brokers issued margin calls for billions of dollars to cover the continuing decline of the firm's portfolio.  On the evening of March 25, Archegos held a call with its prime brokers, and informed them that it was facing approximately $120 billion in gross exposure and just $9-10 billion in remaining equity.  The fund that just days before had been rumored to be worth more than $30 billion was hemorrhaging money.

190.   Hwang and the Executive Defendants tried one last trick to avoid responsibility, asking the prime brokers to enter into a standstill agreement, in which the brokers would agree not to default Archegos while it liquidated its positions.  Unsurprisingly, the prime brokers declined, and the following day the prime brokers put Archegos into default.  After issuing default notices, the prime brokers took over Archegos' accounts, and began to unwind its massive positions held by each broker.  Some brokers were quicker and more efficient than others.  Goldman Sachs, Deutsche Bank, and Wells Fargo were able to sell their Archegos exposure quickly, and all reported immaterial losses.

191.    After it finished selling off its Archegos holdings, Credit Suisse has lost approximately $5.5 billion.  Nomura Holdings reported a loss of approximately $2.9 billion, Morgan Stanley lost approximately $1 billion, UBS lost approximately $774 million, and Mitsubishi lost approximately $300 million.

192.    In total, Hwang and Archegos lost approximately $35 billion, while the prime brokers collectively lost another $10 billion.  The Plan, which was wholly invested in Archegos' Fund, lost approximately $500 million in value for Sullivan and the other Plan participants.

## V.    Archegos After the Collapse

### A.    Defendants Try to Prevent Plan Redemptions.

193.    On March 26, 2021, Archegos management, including Hwang, Mills, Pae, and others, held a firmwide call.  Hwang and the Executive Defendants knew they could not make good on their obligations to employees who elected to redeem their Plan balances and intended to make it clear they should not do so.  Instead of being contrite about the massive losses suffered, Mills resorted to threats.  Mills warned that if any employee was thinking of leaving the firm before the end of March and attempting to collect on their February 2021 Deferred Account total, Archegos "will have none of that" despite it being within the employees' clear contractual rights to do so. Mills further threatened that the "deferred comp is zero. [It] no longer exists. Don't play games and try to quit."

194.    At the same time, Hwang and Mills falsely reassured employees that Archegos would "take care" of them, and that there were ample funds to compensate employees, and told employees there were four available pools of money: (a) the main fund; (b) the Archegos Management Company; (c) Hwang's personal funds; and (d) the Foundation.

195.    Hwang underscored the intermingling of his personal funds with those of the Foundation and Archegos.  First, he told employees that the Foundation "has a strong capital base"

and that the Foundation would be able to continue operating.  Second, Hwang told employees that employment positions would be available for them at the Foundation, and that some Archegos employees had already been selected to transfer over to the Foundation.  Shockingly, Hwang mentioned that some Archegos employees would be given Foundation money to start their own investment funds, from which the Foundation could generate management fees. Mills, Hwang, and Pae stated in this meeting that "the deferred comp is the obligation of the management company."

196.    In a follow-up company call on March 29, 2021, Pae informed employees that between 15-30 Archegos employees could be transferred over to the Foundation, in a process that she was overseeing.  Hwang further noted that these Foundation positions had great potential, with research, investing, and trading opportunities.  They made these purported opportunities known as a way of trying to triage the legal risk they knew they were in – civilly and criminally – by coopting employees who might make claims against them or go to the authorities.

197.    During the same period, Hwang and the Executive Defendants wanted to direct assets from the Foundation back to Archegos but ultimately did not do so because they were advised by counsel that it was illegal, and the situation deteriorated further.

198.    Even in the face of collapse, the Executive Defendants made a concerted effort to scare and prevent any employee from collecting on their contractually owed deferred compensation marked from the prior month.

199.    In addition to Mill's threat days earlier, on March 30, 2021, Sullivan informed Jones that he was going to resign and expected to get paid his full deferred compensation as of February 28, 2021.  Jones told Sullivan that he was being selfish and that the Executive Defendants would have an unfavorable view of Sullivan if he resigned.  Sullivan disregarded these threats and resigned that day.

200.     Many employees who did not resign were offered positions at the Foundation from Pae.  Before Sullivan resigned, Hwang told Sullivan there was likely a position for him at the Foundation, but had no further details and kept it extremely vague, knowing full well that if Sullivan resigned before the end of March, he would be owed the February 2021 balance of his deferred compensation.

**B.     Defendants Refuse to Honor Redemptions.**

201.     When he left Archegos, Sullivan requested the contents of his Individual Plan Account as of February 28, 2021.

202.     Section 4.1 of the Elective Plan Contract and the "Deferred Bonus Payment" section of the Mandatory Plan Contract expressly provides for this 30 day "look back" period, and requires that all deferred compensation be paid within thirty to sixty days of an employee's departure from Archegos.

203.     As of February 28, 2021, Sullivan's Individual Plan Account was valued at approximately $30.5 million.

204.     Together, Hwang, Pae, Mills, Jones, and Halligan all decided that despite Archegos' contractual responsibilities, Archegos would not pay out any deferred compensation.

205.     Despite his express contractual entitlement, Sullivan was told he was not entitled to any deferred compensation, and that none would be paid.  To date, Sullivan has not received any payout of his deferred compensation from his Individual Plan Account.

206.     As part of Archegos and the Executive Defendants attempts to convince Sullivan he was not entitled to his deferred compensation, Archegos and the Executive Defendants along with Defendant EWM misrepresented through the EWM system that Sullivan's and other Plan participants accounts had zero value, and eventually locked them out of their accounts.

207.    Sullivan has received periodic letters from Archegos and the Executive Defendants acknowledging their duty to compensate employees under the Plan, and asking for patience as they attempt to figure out a way to do so.

208.    The actions of Hwang and the Executive Defendants have had lasting effects on Archegos' former employees.  Many former employees have struggled to obtain new employment, and have been told by the investing community that despite their qualifications, many well-respected institutions would never entertain hiring them because of their association with Archegos and the disastrous effect it had on the industry.

209.    As described above, it is evident that Defendants' failure to pay Sullivan his deferred compensation is a direct result of Defendants' fraudulent scheme, failure to properly abide their fiduciary duties, breach of their agreements, and fraudulent misrepresentations and omissions to Sullivans about the status of Archegos and its funds, including those invested in the Plan. Defendants' conduct was the sole cause of the decline in value in Sullivan's account  Further, but for Defendants' repeated manipulation of Archegos employees and direct misstatements about the fund and other Archegos-related issues, Sullivan would have resigned before Archegos' collapse, thereby avoiding the ultimate loss suffered.  Defendants thus directly caused the damages and losses suffered by Sullivan and should be held liable.

210.    Defendants Archegos Capital Management LP, Hwang, Halligan, and Becker were recently subjected to governmental intervention for their role in this exact fraudulent scheme that led to the Archegos downfall and Sullivan's loss.  Hwang and Halligan were indicted by the United States of America on April 25, 2022 for racketeering conspiracy, securities fraud, market manipulation, and wire fraud. Soon thereafter, the United States Securities and Exchange Commission filed an enforcement action against Archegos Capital Management LP, Becker,

Halligan, and another Archegos executive Will Tomita for securities fraud; and Halligan and Arcehgos Capital Management LP were sued by the Commodities and Futures Trading Commission for violations of the Commodity Exchange Act and regulation violations.  In May, Becker partially settled the SEC's claims against him.  The outcomes of these actions as to the remaining Defendants remain pending. Even if those Defendants are convicted or held liable in those actions, Sullivan will not receive his rightful recompense.

## CAUSES OF ACTION

### COUNT ONE
**Breaches of Fiduciary Duty under ERISA § 404(a),**
**29 U.S.C. § 1104(a), 29 U.S.C. § 1132(a)(2), 29 U.S.C. § 1105.**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, Hwang, EWM Global, the Foundation, Mills, Halligan, Jones, Becker, and Pae)

211.    Sullivan reincorporates and realleges ¶¶ 1-210 by reference herein as if stated in full.

212.    The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  *See* 29 U.S.C. § 1003.  The Plan is a Deferred Compensation Plan which is an employee benefit plan within the meaning of ERISA. *See* 29 U.S.C §1002(1)-(3) The Plan is an employee pension benefit plan that is established or maintained by an employer and that by its express terms or as a result of surrounding circumstances results in a deferral of income by employees for periods extending to the termination of covered employment or beyond. *See* 29 U.S.C. § 1002(2). ERISA applies to any employee benefit plan if it is established or maintained by any employer and results in the deferral of income by employees, and plans are only exempt from ERISA governance under limited circumstances and specific facts.

213.    The Plan resulted in the systematic deferral of Sullivan's bonus income.  By the explicit terms of the Plan, Sullivan and other Plan participants were only to receive their bonus income after termination of their employment with Archegos.  In theory, Sullivan could have

received payment of his bonus income after 5 years while currently employed by Archegos, but in practice neither Sullivan nor any other Plan participants were paid out their bonus income after 5 years. The only individual who ever received a pay out from the Plan, received it after leaving Archegos.

214.    The Plan established by Archegos, both Archegos Capital Management LLC and Archegos Capital Management LP, is further subject to ERISA because the Plan created to administer the Deferred Compensation program was an ongoing administrative scheme or arrangement which was intended to provide compensation after termination of employment.  Thus, the Plan is subject to ERISA's governance and implied fiduciary duties, vesting requirements, and disclosure requirements.

215.    The Plan is one deferred compensation plan under ERISA with two parts: a mandatory contribution and an elective contribution.  However, the Plan must be viewed in its entirety and, pursuant to ERISA, is treated as one whole Plan.  The Deferred Payments, whether mandatory or "elective," were all contributed to the same Archegos Fund – Defendant Archegos Fund LP.

216.    During the first year of the Plan at the end of 2016 it was offered to more than 20 of Archegos' 27 employees.  Eventually, the mandatory part of the Plan was imposed on all employees.   The Plan was offered to all employees regardless of position, managerial responsibilities, income level, or ability to negotiate the terms of the Plan and defend their interests.

217.    When the Plan expanded to include an elective portion, the elective portion was offered to more than 15% of Archegos employees, and continually expanded every year until its final year in 2020.

218.    Sullivan is a participant in the Plan as defined in 29 U.S.C. §1002(7).  Sullivan brings this action in his individual capacities pursuant to 29 U.S.C. § 1132(a)(2).  Defendants' negligent and fraudulent actions breached their fiduciary duties which impaired the value of the Plan assets in Sullivan's Individual Plan Account.  Any relief ordered by the Court pursuant to § 1132(a)(2) and §1109(a) will restore the losses to Sullivan's Individual Plan Account by personally making good to the Plan any losses resulting from the Defendants' fiduciary breaches. The losses will insure to the Plan through the Fund and then flow to Sullivan's Individual Plan Account. The Defendants all knew of and facilitated the breaches of all the other fiduciaries and are therefore jointly and severally liable for losses resulting from those breaches. *See* 29 U.S.C. §1105.

219.    At the end of February 2021, the Fund contained approximately $500 million of deferred compensation from Sullivan and other Plan participants.  The Fund contained at least $50 million of the Sullivan's deferred compensation at the peak in March.  As of the date of filing the Executive Defendants assert that the Fund has no value.

220.    The ERISA Defendants are all fiduciaries of the Plan under ERISA § 409, 29 U.S.C. § 1109, and therefore owed a fiduciary duty to the Plan, Sullivan, and each Plan participant. *See* 29 U.S.C. § 1002(21)(A).   Each of the ERISA Defendants, as alleged more fully above, exercised control over the Plan and was involved in its administration, establishment of policies and procedures, and made investing decisions for the Plan assets.

221.    Specifically, Archegos Capital Management LLC and Archegos Capital Management LP created, facilitated, and managed the Plan, and its agents the Executive Defendants managed and enacted the Plan. Archegos Fund LP, in many respects, was the Plan. All Plan assets were attributed and comingled in the Fund, the Plan assets rose with the Fund, and

ultimately fell with the Fund. Pae, Mills, and Hwang designed the Plan, and were the internal Plan administrators at Archegos, responsible for communicating all critical Plan advice, terms, and information to the Sullivan and Plan participants.   Archegos and the Executive Defendants determined all the material terms and conditions of the Plan documents and contracts, these Defendants determined how the Plan was to be administered.   More importantly, Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund, Hwang, Mills, Halligan, Jones, Becker made the critical decisions of how the Plan assets would be invested, how the Plan assets would be – or not be – protected. Halligan as CFO has the critical role of managing the Plan, tracking the returns, deciding how much each employee could or must invest in the Plan, advising on investing decisions for the Fund and consequently the Plan. Jones had a critical role in advising Hwang on Plan asset investment decisions as director of research and co-President.   Becker, as the Chief Risk Officer of Archegos had the responsibility to manage the risk to the Plan assets and ensure there was sufficient liquidity to cover Plan redemptions.   Hwang, advised by the Executive Defendants, made all investing decisions related to the Plan assets.

222.   EWM Global served as the external administrator of the Plan and Plan assets and managed the Plan participant accounts.   EWM determined what amount was in each account and represented those amounts to the Sullivan through his Individual Plan Account portal.   EWM was also charged with disseminating all Plan information and statements.

223.   Each of the ERISA Defendants was obligated to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of the Plan. *See* 29 U.S.C. § 1104(a)(1)(A).  As fiduciaries, the ERISA Defendants owed the Sullivan a duty to perform their duties with the care, skill, prudence, and diligence under the circumstances that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of

an enterprise of a like character with like aims.  *See* 29 U.S.C. § 1104(a)(1)(A)-(D).

224.    Throughout 2020 and 2021, the ERISA Defendants breached their fiduciary duties

by, among other issues:

- Creating an environment of pressure and inducement to force Sullivan's participation in the Plan;

- Managing the Plan for the benefit of Hwang and his alter ego Foundation rather than the benefit of Plan participants;

- Making false and misleading statements regarding the safety of participation in the Plan and the Plan's financial status and outlook;

- Retaliating against Plan participants who chose to defer less than the maximum allowable amount of their compensation;

- Instituting the Plan for self-serving purposes of capital preservation and tax burden reallocation;

- Failing to provide Sullivan and other Plan participants with information allowing them to make informed decisions regarding their continued participation in the Plan;

- Mismanaging the Plan through fraudulent and reckless stock trading activity which eroded the Plan's value and resulted in a lack of funding, depriving Sullivan of his previously "guaranteed" compensation;

- Misrepresenting the value of Sullivan's Individual Plan Accounts as $0 after the Fund crash; and

- Failing to diversify the Plan's investments so as to minimize the risk of catastrophic loss (*see* 29 U.S.C. § 1104(a)(1)(C)).

225.    The damages to Sullivan includes the alleged loss of all value in his Individual Plan

Account.  The loss of the value to Sullivan's Individual Plan Account was directly caused by these

Defendants' systematic mismanagement of the Plan and their breaches of fiduciary duties.

226.    As a direct and proximate result of the ERISA Defendants' breaches of their

fiduciary duties and ERISA violations, Sullivan has been deprived of the value of his Individual

Plan Account.  Sullivan is entitled to the restoration of the value of his Individual Plan Account, the disgorgement or restitution to his Individual Plan Account of the pro rata share of any profits gained by the ERISA Defendants, and any other equitable or remedial relief as the Court deems appropriate. *See* 29 U.S.C. § 1109.  Sullivan is entitled to the restoration of the full value of his account as well as the unrealized gains associated with that account for the value the account would have had if the Plan assets had been prudently invested. The ERISA Defendants' breaches of fiduciary duty also entitle Sullivan to attorneys' fees and costs.

227.    Defendants' actions breached their fiduciary duties under ERISA §404(a), 29 U.S.C. §1104(a) which is actionable through 29 U.S.C. §1132(a)(2).  Sullivan is thus entitled to appropriate relief to redress the aforementioned Defendants' violations of their obligations to Sullivan, other plan participants, and the Plan under ERISA.

228.    Sullivan thus requests that the Court enter judgment against Defendants, holding the Defendants jointly and severally liable, for repayment to Sullivan's Individual Plan Account and making good of all losses, including anticipated profits, to the flow through the Plan to Sullivan's Individual Plan Account due to the Defendants' breaches of fiduciary duties. *See* 29 U.S.C. § 1105; 29 U.S.C. § 1109.

229.    In the alternative, Sullivan pleads for relief in the form of plan wide relief.  *See* 29 U.S.C. § 1109.  Sullivan seeks the remedy of restoration to the Plan any losses attributable to the breaches of the fiduciaries. The Plan shall be restored by the named co-fiduciaries being held jointly and severally liable for the losses attributable to their breaches, the Plan shall be restored through the disgorgement or to the Plan of any profits gained by the ERISA Defendants, and any other equitable or remedial relief as the Court deems appropriate. *See* 29 U.S.C. § 1109;  29 U.S.C. § 1105.  Relief shall be granted to the Plan as a whole in the form of restoration of the full value

of each Plan participants' accounts as well as the unrealized gains associated with those accounts for the value the accounts would have had if the Plan assets had been prudently invested, to be no less than $50,000,000 to Sullivan's Individual Plan Account.

230.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable under Count One.

231.    To the extent this Court orders the ERISA Defendants to compensate the Plan for losses caused by their breaches, Sullivan requests that the Court order the ERISA Defendants to provide any owed payments out of their personal funds, making whole all losses to the Plan resulting from each such breach, and restoring to the Plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary.

**COUNT TWO**
**Improper Transfer of Fund Assets and Breach of the Fiduciary Duty of Loyalty Under 29 U.S.C. § 1106 and 29 U.S.C. §1132(a)(2)**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

232.    Sullivan reincorporates and realleges ¶¶ 1-231 by reference herein as if stated in full.

233.    As discussed above, the Plan is, and at all times has been governed by ERISA, which bars Plan fiduciaries from engaging in certain prohibited transactions Pursuant to 29 U.S.C. § 1106.

234.    Defendants named in this Count are fiduciaries of the Plan based on their active management and administration of the Plan, including *inter alia*, investing the Plan assets, deciding on Plan terms, and exercising discretionary control over the Plan's administration as alleged more fully above and in Count One.  The Defendants as Plan fiduciaries may not engage in certain transactions with the Plan assets.

235.     Defendants Archegos Capital Management LLC, Archegos Capital Management LP, and Hwang, who managed the Fund which included all Plan assets, treated the Fund's—and therefore the Plan's—assets as their own, using them interchangeably with their own funds.  As described throughout this Complaint, the Archegos Fund was essentially Hwang's personal fund.  By investing all Plan assets into the Fund, without proper protection and segmentation of the Plan assets, Hwang, the two Archegos entities, and the Fund were using the Plan assets for their own benefit. *See* 29 U.S.C. § 1106(b)(1).

236.     The two Archegos entities, Hwang, Mills, Pae, Becker, Jones, and Halligan directed assets of the Fund, which was co-mingled with the Plan assets, to be distributed to the Foundation.  Defendants routinely transferred stock, equities, and assets of the Fund to the Foundation without due consideration.  As alleged more fully below, Hwang and Archegos are alter egos of the Foundation.  Thus, the transfer of any Plan asset to the Foundation is impermissible under 29 U.S.C. § 1106(a)(1)(D).

237.     Defendants have treated the Foundation as a symbiotic relationship, the Foundation was gifted securities, stocks, and equities in times of extreme profit, and the Defendants attempted to raid the Foundation's assets when Archegos crashed.  The Defendants wanted to direct assets from the Foundation back to the Fund, but were advised such an action was illegal.  They also used the Foundation's asset base to induce employees to stay past March 2021 and forfeit their February 2021 balance.

238.     Defendants Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, Hwang, Mills, Halligan, Jones, Becker, and Pae have directed the transfer of valuable stock, equities, and assets from the Fund to the Foundation. The Defendants must restore the value of those transferred assets to the Plan. *See* 29 U.S.C. §1109(a).

239.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivan on Count Two.

**COUNT THREE**
**Wrongful Denial of Benefits Under 29 U.S.C. § 1132(a)(1)(B)**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation)

240.    Sullivan reincorporates and realleges ¶¶ 1-239 by reference herein as if stated in full.

241.    As discussed above, the Plan is, and at all times has been governed by ERISA, which provides a private right of action under 29 U.S.C. § 1132(a)(1)(B) to recover benefits due to Sullivan under the terms of the Plan.

242.    As alleged herein, Sullivan was provided and executed Plan Contracts which dictated the benefits to which Sullivan was entitled under the Plan.  Pursuant to the Plan Contracts, Sullivan was to be paid out the full value of his Individual Plan Account, which included the original Deferred Payments plus the proportional increase tied to the Fund value, the sooner of five years or his separation from employment at Archegos, earmarked to the value of his Individual Plan Account at the end date of the month prior to separation.

243.    Prior to his separation from employment at Archegos, the Defendants falsely misrepresented that Sullivan's Individual Plan Account was at zero and that Sullivan would not be entitled to any payment on departure. Despite this misrepresentation, Sullivan resigned from Archegos on March 30, 2021 and made a demand for the payment of his Individual Plan Account. Under the Plan Contracts, Sullivan was entitled to the payment of his account as of the last date of the month prior to his separation from employment at Archegos. Sullivan made clear in his demand to redeem his Individual Plan Account that the value of the Account was the value it held on the

closing of February 2021. Jones and Mills acknowledged that this February valuation was correct in their statements in March 2021, when they were trying to intimidate and shame Sullivan into staying.

244.    Despite this clear obligation, the Defendants failed to pay Sullivan the amount in his Individual Plan Account.  The Defendants wrongly denied Sullivan benefits due to them under the Plan.   The Defendants depleted the value of the Sullivan's account through their mismanagement of Plan investments. This wrongful denial of benefits violates 29 U.S.C. § 1132(a)(1)(B).  In fact, the Defendants took it upon themselves to use remaining money in the Archegos fund to pay salaries for 3 months for remaining loyal employees and to not use remaining money to pay out Sullivan and Plan participants the money they were owed.

245.    As a result of these Defendants' improper denial of benefits and depletion of assets via mismanagement and violations of fiduciary duties, the proper remedy is the payment of Sullivan's full benefits to which he is entitled under the Plan contracts.

246.    Sullivan is entitled to at least $30,500,000 plus all applicable pre-judgment and post-judgment interest.

**COUNT FOUR**
**Breaches of Duty to Disclose under 29 CFR § 2520.104b-1,**
**29 CFR § 2520.102-3, 29 U.S.C. §1132(a)(1)(A), 29 U.S.C. §1132(c)**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

247.    Sullivan reincorporates and realleges ¶¶ 1-246 by reference herein as if stated in full.

248.    ERISA mandates that the Plan fiduciaries (which include each of these Defendants) provide to all Plan Participants a Summary Disclosure setting forth the material terms and

provisions of the Plan as well as the investment strategy and details of how the Plan assets will be managed and invested. 29 U.S.C § 1021, § 1022(a)(1).

249.   Defendants have never provided the requisite Plan Summary Disclosures during any year of the Plan's operation.   Moreover, the Defendants purposefully obfuscated the information that would typically be reflected in the Summary Plan Disclosure provided to Sullivan and Plan participants about how contributions work, how distributions work, how vesting works. *See* 29 CFR § 2520.102-3.  The Summary Plan Disclosure is an essential document because it is a plain language explanation of how the Plan functions.

250.   The Defendants' failure to disclose this statutorily required information directly contributed to the concealment of Defendants' improper activities and amplified Sullivan's losses upon the Plan's collapse.  Had Sullivan been aware of the information typically contained in the disclosures, he likely would have elected to make alternative decisions regarding his deferred compensation assets. As a direct and proximate result of the ERISA Defendants' breaches of their disclosure duties and violations of ERISA, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages, equitable relief, and any other appropriate relief.  The ERISA Defendants breaches of duty of disclosure entitle the Sullivan's to attorneys' fees and costs.

## COUNT FIVE
### Equitable Estoppel and False Misrepresentation under 29 U.S.C. § 1132(a)(3)
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

251.   Sullivan reincorporates and realleges ¶¶ 1-250 by reference herein as if stated in full.

252.     As Sullivan alleged above, each of these Defendants are Plan fiduciaries under 29 U.S.C. § 1002(21)(A).   In the alternative, if any of these Defendants are found to not be Plan fiduciaries, then they are liable for their misrepresentations, participation in the Plan fiduciaries' breaches, and facilitation of the improper transfer of assets to the Foundation under 29 U.S.C §1132(a)(3).

253.     Under 29 U.S.C. §1132(a)(3) a Plan participant or beneficiary may enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

254.     These Defendants' misrepresentations regarding the terms of the Plan, the Defendants obligations to participate in the Plan, and the risks associated with participation in the Plan deprived Sullivan of the opportunity to make an informed and free decision whether to participate in the Plan.   These misrepresentations ultimately deprived Sullivan of millions of dollars of compensation.  The ERISA Defendants misrepresentations render them liable under 29 U.S.C §1132(a)(3).

255.     As alleged fully above, Defendants repeatedly made material, false representations to Sullivan, as well as failed to disclose material information which Defendants had a duty to disclose.  The material misrepresentations included, inter alia, misstating the liquidity of the Fund, misstating of the fund's risk profile and solvency, misstating the status of the leverage and margin available to the Fund, misstating the investment strategy and the risks of the strategy, failing to mention while having a duty to do so the status of the prime brokers calls to increase the margin on the Fund in order to avoid recall of margins, failing to even mention the leverage limits that were negotiated with the prime brokers, misstatements that investing in the Fund was risk free,

misstating that Sullivan would not lose any of the principle of his deferred bonuses, misstating the value of Sullivan's Individual Plan Account after the Fund's crash as "zero." These Defendants through the EWM system misrepresented Sullivan's account as having zero value.

256.    The misstatements were made with the intent to mislead Sullivan.  Defendants had a vested interest in perpetuating the fraudulent scheme of the investing strategy of the Fund.  Each of the Defendants were rewarded based on the loyalty of carrying out Hwang's orders and the success of this overly risky investment strategy.  Further, Defendants, especially Hwang, needed to maintain a positive outlook among employees to avoid an exodus that would both drain the Plan funds and leave Archegos without a qualified staff during a difficult period.

257.    Specifically, the Defendants misrepresented the risks of the "elective" portion of the Plan and how there was no risk and only reward if Sullivan contributed because he would never lose the principal of his investment.  Defendants furthered these fraudulent misrepresentations by creating a misleading bifurcation between how the mandatory contributions were governed under the Plan and how the "elective" contributions were governed. As the Mandatory Plan Contracts initially reaffirmed the Defendants' oral statements that no principal of the Deferred Payments would ever be lost, Sullivan was led to believe that the "elective" distributions were treated the same under the Plan.  The confusing bifurcation was misleading to Sullivan, and therefore, he relied upon the Defendants explanations of how the Plan worked.

258.    Sullivan reasonably relied on the veracity of the statements made by the Defendants.  The Defendants are all highly ranked Archegos executives and the company itself, as alleged above, Sullivan placed confidence in Defendants and relied on the Defendants to provide truthful representations of the Deferred Compensation Plan and its associated risks.  The relationship was strengthened by Sullivan's employment by Archegos, placing him in a position

where he was inherently forced to rely on the representations being provided by his employers, or face potential professional consequences for disagreeing with a known, volatile executive.

259.    Sullivan's reliance was reasonable because Sullivan had no independent ability to verify the truth or falsity of the misrepresentations, Defendants had superior knowledge and shielded the truth from Sullivan by strictly limiting his access to information which might allow Sullivan to discover the fraud.  Moreover, as alleged above, Defendants intentionally curated a cult-like environment which instilled in Sullivan a trust and confidence in the Defendants.

260.    As alleged more fully in Count Three, the Defendants improperly facilitated the transfer of Plan assets in the form of valuable stock, equities, and assets from the Fund to the Foundation. The transfers are a violation of ERISA, and therefore a violation of 29 U.S.C §1132(a)(3).

261.    As alleged more fully in Count One and Count Thirteen, the Defendants each were knowledgeable of and assisted in the breaches of fiduciary duties of the others. A fiduciary's breach is a violation of 29 U.S.C. §1104(a), which is a violation of ERISA.  The ERISA Defendants knowledge of and substantial assistance in the fiduciaries' breaches renders them liable 29 U.S.C §1132(a)(3).

262.    Defendants' misrepresentations, improper transfers, and aiding and abetting of fiduciaries' breaches render them liable under 29 U.S.C §1132(a)(3).   Under this provision, Sullivan is entitled to appropriate equitable relief.  Here, the Defendants should be required to disgorge to Sullivan's account any amounts that the Defendants improperly gained from their misrepresentations and violations of ERISA. The Foundation or any other accounts, such as Hwang's personal accounts or trusts, should be ordered under 29 U.S.C §1132(a)(3) to disgorge any stock, equities, and assets it received from the Defendants that belonged to the Plan or the

Fund. The Defendants should be ordered to restitute Sulllivan's Individual Plan Account for any amounts improperly transferred to the Foundation. Sullivan is entitled to any other equitable relief to redress the Defendants violations of ERISA the Court deems appropriate.

## COUNT SIX
### Breach of Contract with Sullivan
(Against Archegos Capital Management LLC, Archegos Capital Management LP, and the Foundation)

263.    Sullivan reincorporates and realleges ¶¶1-262 by reference herein as if stated in full.

264.    Sullivan entered into multiple contracts which govern this action.  Sullivan entered into the 2016, 2017, 2018, 2019, and 2020 Mandatory Plan Contracts and the 2018, 2019, and 2020 Elective Plan Contracts with Archegos.

265.    Per the terms and conditions of the Plan Contracts, 15% of Sullivan's bonus compensation was deferred in 2016, 25% of Sullivan's bonus compensation was deferred in 2017, 50% of Sullivan's bonus compensation was deferred in 2018, and 60% of Sullivan's bonus compensation was deferred in both 2019 and 2020.

266.    Pursuant to the Plan Contracts, Sullivan was to be paid out the full value of his Individual Plan Account, which included the original Deferred Payments plus the proportional increase tied to the Fund value, the sooner of five years or his separation from employment at Archegos.

267.    On March 30, 2021, Sullivan resigned from Archegos, effectively separating from employment at Archegos without cause as of that date.

268.    Per the Plan Contracts, Sullivan was entitled to the full value of his total Deferral Payment Accounts as of February 28, 2021.

269.    The total value of the Deferred Bonus Payments accounts to which Sullivan is entitled by contract upon his departure is $30,500,000 to $50,000,000.

270.    As of the date of this filing, Sullivan has received no payment of any kind from Archegos, let alone the up to $50,000,000 to which he is entitled.

271.    Sullivan fully performed his obligations under each of his Plan Contracts by, *inter alia,* timely deferring his bonus compensation to the Fund, separating from service without being terminated for cause, and making a claim to redeem his Individual Plan Account.

272.    As set forth herein, Archegos materially breached the Plan Contracts by, *inter alia*, failing to pay out Sullivan the values of his Individual Plan Account upon or within the 30 to 60 days of the Applicable Payment date on which Sullivans separated from service. Archegos has entirely failed to render any payments to the Sullivan.

273.    The damages suffered by the Sullivan were caused directly by Archegos.  As a direct and proximate result of Archegos' breach of the contracts Sullivan has suffered, and continues to suffer, monetary and economic harm, for which he is entitled to an award of damages in an amount between 30,5000,000 and $50,000,000 plus all applicable pre-judgment and post-judgment interest.

274.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivan on Count Six.

## COUNT SEVEN
### Common Law Breach of Fiduciary Duty
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

275.    Sullivan reincorporates and realleges ¶¶ 1-274 by reference herein as if stated in full.

276.    In addition to the fiduciary duty created by virtue of these Defendants' management of the Plan, Archegos, the Foundation, Hwang, Mills, Halligan, Becker, and Pae each owed a fiduciary duty to Sullivan by virtue of their absolute control of the Plan, the Funf, and the special position of trust created with Sullivan as custodians of his deferred compensation savings.

277.    As described throughout this Complaint, Defendants fostered an environment in which Sullivan and other Archegos employees were pressured, and in some cases forced, to participate in the Plan with a significant percentage of their annual compensation.  Once he agreed to participate in the Plan, Sullivan was forced to rely on information provided by Defendants, and Defendants maintained absolute control over the Plan's allocation and performance.   When Sullivan asked questions related to the health of the Plan, Defendants lied to him.

278.    Sullivan reasonably believed that the Defendants were his fiduciaries who were bound to act in his best interest.  Sullivan was continually told to "trust in Bill" and that the careful management of the Sullivan's and other Plan Participants deferred compensation was of critical importance.  The Defendants told Sullivan that the Plan was a means for Hwang to be generous to his employees, a way for him to look out for them, and that he took the responsibility of managing their money very seriously.

279.    In January 2021, Defendants further ensured that Sullivan was forced to rely on them for administration of the Plan when Hwang and the other senior managers at Archegos unilaterally decided to severely limit the information available to Sullivan regarding the Plan's liquidity.  This activity further cemented the fiduciary duty between Sullivan and Defendants.

280.    Beginning in December 2020, Defendants repeatedly and flagrantly violated the fiduciary duties owed to Sullivan as an investor in the Plan, by providing false statements to

Sullivan, as well as the prime brokers, about the true nature of the Portfolio's investments and risk profile.

281.    Defendants also repeatedly misrepresented the Plan's risk profile, falsely telling Sullivan that the Plan (as part of the Archegos Fund) was properly hedged with cash on hand, when Defendants knew such information to be false.  Finally, Defendants blatantly misled Sullivan by telling him that his principal investment plus certain returns was "guaranteed," when they knew that no such guarantee could be made, and when Archegos suffered a collapse and no effort was made to recoup losses or provide Sullivan with the value of his Individual Plan Account or even his "guaranteed" principal returns.   Each of these bad faith misrepresentations violated Defendants' fiduciary duties.

282.    Hwang further violated his duties to Sullivan by siphoning Plan funds to his Foundation, where they were used for his own personal benefit.  This misappropriation and decision to place his own interests above those of Archegos, the Plan, and the Plan participants, constitutes a further violation of Hwang's fiduciary duties.

283.    Defendants abused the trust and confidence Sullivan placed in them, and rather than acting in his best interest forced Sullivan to forfeit compensation to which he was rightfully entitled, misrepresented that the contributions would be protected and would not fall beneath his initial contribution levels, mismanaged those assets, and systematically limited access to any information that would allow Sullivan to learn of the asset mismanagement.

284.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Sullivan has suffered, and continue to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages, equitable relief, and any other appropriate relief.

The Defendants willful and wanton breaches of fiduciary duty entitle Sullivan to punitive damages, attorneys' fees, and related costs.

285.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivan on Count Seven.

**COUNT EIGHT**
**Fraud**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

286.    Sullivan reincorporates and realleges ¶¶ 1-285 by reference herein as if stated in full.

287.    As alleged fully above, Defendants repeatedly made material, false representations to Sullivan, as well as failed to disclose material information which Defendants had a duty to disclose.  The material misrepresentations included, *inter alia*, misstating the liquidity of the Fund, misstating of the fund's risk profile and solvency, misstating the status of the leverage and margin available to the Fund, misstating the investment strategy and the risks of the strategy, failing to mention while having a duty to do so the status of the prime brokers calls to increase the margin on the Fund in order to avoid recall of margins, misstatements that investing in the Fund was risk free, misstating that the Sullivan would not lose any of the principle of his deferred bonuses, misstating the value of Sullivan's Deferred Compensation Accounts after the Fund's crash as "zero."

288.    The misstatements were made with the intent to defraud Sullivan.  Defendants had a vested interest in perpetuating the fraudulent scheme of the investing strategy of the Fund.  Each of the Defendants were rewarded based on the success of this overly risky investment strategy. Further, Defendants, especially Hwang, needed to maintain a positive outlook among employees

to avoid an exodus that would both drain the Plan funds and leave Archegos without a qualified staff during a difficult period.

289.   Specifically, the Defendants misrepresented the risks of the "elective" Deferred Compensation Plan itself and how there was no risk and only reward if Sullivan contributed because he would never lose the principal of their investment.   Defendants furthered these fraudulent misrepresentations by creating a misleading bifurcation between how the mandatory contributions were governed under the Plan and how the "elective" contributions were governed. As the Mandatory Plan Contracts reaffirmed the Defendants oral statements that no principal of the Deferred Payments would ever be lost, Sullivan was led to believe that the "elective" distributions were treated the same under the Plan.   The confusing bifurcation was misleading to Sullivan, therefore, he relied upon the Defendants explanations of how the Plan worked.

290.   Sullivan reasonably relied on the veracity of the statements made by the Defendants.   The Defendants are all highly ranked Archegos executives and the company itself, as alleged above, Sullivan placed confidence in Defendants and relied on the Defendants to provide truthful representations of the Deferred Compensation Plan and its associated risks.   The relationship was strengthened Sullivan's employment by Archegos, placing him in a position where he was inherently forced to rely on the representations being provided by his employer, or face potential professional consequences for disagreeing with a known, volatile executive.

291.   Sullivan's reliance was reasonable because he had no independent ability to verify the truth or falsity of the misrepresentations, Defendants had superior knowledge and shielded the truth from Sullivan by strictly limiting their access to information which might allow the Sullivans to discover the fraud.   Moreover, as alleged above, Defendants intentionally curated a cult-like environment which instilled in Sullivan a trust and confidence in the Defendants.

292.    As a direct and proximate result of the Defendants' fraudulent misrepresentations, Sullivan has suffered, and continue to suffer, monetary and/or economic harm in the form of unpaid deferred compensation due to him under the terms of the Plan, for which he is entitled to an award of monetary damages, equitable relief, and any other appropriate relief.

293.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Ten.

## COUNT ELEVEN
### Constructive Fraud
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

294.    Sullivans reincorporate and reallege ¶¶ 1-293 by reference herein as if stated in full.

295.    As set forth herein, the above-named Defendants constructively defrauded Sullivan through material misrepresentations regarding the Plan.

296.    As described above, Defendants made misrepresentations and material omissions to Sullivan regarding the Plan and Sullivan's deferred compensation.  Sullivan relied on those statements to his detriment, suffering damages as a result.

297.    Further, Defendants each owed Sullivan a special duty of care due to the fiduciary duties implied at law onto these Defendants under ERISA obligations and the common law.

298.    As a direct and proximate result of the Defendants' fraudulent misrepresentations and omissions, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which they are entitled to an award of monetary damages, equitable relief, and any other appropriate relief.

## COUNT TWELVE
### Fraudulent Inducement

(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

299.    Sullivan reincorporates and realleges ¶¶ 1-298 by reference herein as if stated in full.

300.    As set forth above, the above Defendants knowingly made material misrepresentations and omitted material facts when under a duty to disclose, in order to induce Sullivans to rely on those statements.

301.    Defendants misrepresented to Sullivan both orally and in their confirmation of bonus award letters that Sullivan would never lose the principal investment of his deferred bonuses, even if Sullivan invested in the Plans.  Defendants misrepresented that the Fund holding the Plan funds were properly liquid and that the risk in the portfolio was appropriately managed and hedged, with full knowledge that no such hedges or risk mitigation had been or would be implemented.

302.    Defendants further misrepresented to Sullivan that he had the option of converting his Deferred Compensation into an alternative fund that he would be able to independently manage, given that Sullivan had expressed concerns about the risk profile of the Fund.

303.    Defendants knew their statements were false and misleading at the time they were made, but did so anyway with the intent to keep Sullivan from questioning his investment in the Plan or thinking about leaving Archegos.

304.    Sullivan reasonably relied on these fraudulent misrepresentations, by choosing to defer his bonuses into the Plan and by failing to remove his funds from the Deferred Compensation Plan.

305.    Had Sullivan known that these statements were false, he would not have either chosen to defer his bonuses into the Plan, or continued to leave his funds in the Plan.

306.     As a direct and proximate result of the Defendants' fraudulent misrepresentations, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages, equitable relief, and any other appropriate relief.

307.     As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivan on Count Twelve.

### COUNT THIRTEEN
### Aiding and Abetting Fraud
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

308.     Sullivan reincorporates and realleges ¶¶ 1-307 by reference herein as if stated in full.

309.     As set forth above, Archegos, Hwang, Mills, Pae, Halligan, Becker, and Jones have all committed fraud in connection with Sullivan's investment in the Plan.  Each Defendant at all times knew of others making fraudulent misstatements regarding the Plan, participated in the scheme to effectuate the fraud, and substantially assisted others in spreading and perpetuating fraudulent misrepresentations.

310.     Specifically, the Foundation, Hwang, Mills, Pae, Halligan, and Jones were all aware that Archegos and Hwang had materially increased the risk profile of the Portfolio by, among other things, failing to engage with and adequately respond to the Prime Broker Defendants' calls for additional margin, misrepresenting key facts about the Fund to the Prime Brokers, removing all liquidity from the portfolio, misstating the status of the leverage and margin available to the Fund, misstating the investment strategy and its risk, and failing to adequately de-risk the Portfolio.

311.     Despite having this knowledge, the Foundation, Hwang, Mills, Pae, Halligan, Becker, and Jones substantially assisted Archegos and Hwang with this fraudulent scheme by

continuing to convey to Sullivan that the Portfolio was well hedged, with ample cash on hand, and that Hwang was in the process of actively de-risking, and begging Sullivan to stay at Archegos. Defendants knew these statements to be false, and knew that they were being made with the intent to coerce specific behavior, namely the employees' continued work for Archegos and continued investment in the Plan.

312.     Sullivan relied on these misstatements in remaining at Archegos, and not collecting on his Deferred Compensation.

313.     As a direct and proximate result of the Defendants' aiding and abetting of fraud, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief. The damages suffered by Sullivan were reasonably foreseeable to the Defendants who substantially assisted and participated in the fraudulent scheme.

### COUNT FOURTEEN
### Aiding and Abetting Breach of Fiduciary Duty
(Against Hwang, the Foundation, Mills, Pae, Halligan, Becker, and Jones)

314.     Sullivan reincorporates and realleges ¶¶ 1-313 by reference herein as if stated in full.

315.     As set forth above, Sullivan alleges that above-referenced Defendants aided and abetted breaches of fiduciary duty owed under ERISA and the common law.

316.     The above-referenced Defendants each knowingly induced or participated in the breaches detailed above.  The Foundation, Hwang, Mills, Pae, Halligan, Becker, and Jones all directly participated and substantially assisted in other Defendants' breaches of fiduciary duties by facilitating the misrepresentations to Sullivan, including those designed to create a relationship of

trust between Hwang and his employees for purposes of deferred compensation, and by knowingly assisting in the maintenance of the Fund which was being mismanaged.

317.    As a direct and proximate result of the Defendants' aiding and abetting of breach of fiduciary duty, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which they are entitled to an award of monetary damages and any other appropriate relief.

318.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Fourteen.

## COUNT FIFTEEN
### Negligent Misrepresentation
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

319.    Sullivan reincorporates and realleges ¶¶ 1-318 by reference herein as if stated in full.

320.    As set forth above, the above-referenced Defendants made numerous statements designed to provide comfort Sullivan and other Archegos employees.  As discussed above, these statements were fraudulent.  However, to the extent such statements were not intentionally fraudulent (which they were), Defendants' statements constitute negligent misstatements regarding the Plan and the Fund's investment strategy.

321.    By virtue of their positions within the Archegos management structure, Defendants had a duty to exercise reasonable care in providing information about the Plan and the Fund's investment strategy to Sullivan.

322.    Defendants breached this duty by making false statements and misrepresentations regarding the Plan and the Fund's investment strategy.

323.    The negligent misrepresentations included, inter alia, Defendants' statements that their initial investment principal was "guaranteed" as a floor of their deferred compensation. In 2016 and 2017, the Deferred Compensation under the Plan was subjected to increased protections, which the Defendants heavily emphasized.  Defendants reiterated to Sullivan that there was no downside to deferring compensation, that there was no risk, that the deferred compensation would be protected, and that the deferred compensation profits were added to the principal amount each year and would not decrease once capitalized.  Sullivan continued to believe that through the entirety of the Plan, even when Defendants revised the Plan documents to remove those protections.

324.    Defendants made numerous negligent misrepresentations about what was possible under the Plan, especially with respect to the use of the Deferred Compensation to create "funds of one."  Sullivan was led to believe that the deferred compensation being set aside could one day be extracted to create a "fund of one" to allow him to manage his own fund under the Archegos umbrella.  Specifically, Sullivan was told this repeatedly by Jones, Pae, and Mills.  Defendants continued to propagate that misunderstanding into 2021, when the fund investing strategy was becoming increasingly risky that Sullivan met with Defendant Mills and Jones and demanded to move his deferred compensation to a "fund of one," in order to allow Sullivan the ability to manage his money himself.  This never occurred, and Hwang never intended to allow Sullivan to manage money in this way.

325.    At the time they made the statements, Defendants knew that Sullivans would reasonably rely on the Defendants statements about the Plan and the Fund's investment strategy,

and knew that the provision of this information was for a serious purpose and that Sullivan would act in reliance on this information.

326.    Defendants possessed a unique and specialized expertise not only about the Plan and the Fund's investing strategy, but the information was proprietary.  Sullivan, who worked for Hwang and had long been discouraged from challenging any of his ideas or thoughts, had no means of independently assessing the veracity of the statements.  Defendants were thus the sole authority on these issues.

327.    As a direct and proximate result of the Defendants' negligent misrepresentations, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief.

328.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Fifteen.

### COUNT SIXTEEN
### Promissory Estoppel
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

329.    Sullivan reincorporates and realleges ¶¶ 1-328 by reference herein as if stated in full.

330.    As set forth above, Sullivan was initially induced to participate in the Plan by virtue of a promise that his initial investment principal was "guaranteed" as a floor of his deferred compensation. In 2016 and 2017, the deferred compensation under the Plan was subjected to increased protections, which the Defendants heavily emphasized.  The Defendants reiterated to Sullivan that there was no downside to deferring compensation, that there was no risk, that the deferred compensation would be protected, and that the deferred compensation profits were added

to the principal amount each year and would not decrease once capitalized.  Sullivan continued to believe that through the entirety of the Plan, even when the Defendants revised the Plan documents to remove those protections.

331.    In December 2020 and January to March 2021, Defendants made repeated statements designed to underscore these "promises," with a specific goal of inducing cooperation from Sullivan in the form of continued employment and investment in the Plan.

332.    Because the information was coming from trusted executives and authority figures within Archegos, Sullivan detrimentally relied on oral representations made by the above-referenced Defendants as to how the Plan would operate, how the funds would be invested and managed, and how distributions would be paid.  Sullivan detrimentally relied upon various representations by the Defendants about the potential to create a "fund of one" from the deferred compensation.  Sullivan was led to believe that the deferred compensation being set aside could one day be extracted to create a "fund of one" to allow him to manage his own funds under the Archegos umbrella.  Defendants continued to propagate that misunderstanding into 2021, when the fund investing strategy was becoming increasingly risky that Sullivan met with Defendants Mills and Jones and demanded to move his deferred compensation to a "fund of one", in order to allow Sullivan the ability to manage his money himself.  Suddenly, Defendant Hwang "realized" that extracting assets from the Plan in this manner was not possible.

333.    Sullivan detrimentally relied upon these misrepresentations as to how the Plan functioned and what was allowed under the Plan, and in reliance upon those representations continued to elect to defer the maximum amount in the Plan.

334.    Sullivan relied upon oral representations made to him after Archegos' collapse at the end of March 2021.  The Defendants told Sullivan that "the deferred comp is zero" and that

the Defendants did not need to pay out Sullivan his deferred compensation even if Sullivan quit and made claim to his Individual Plan Account. The Defendants misrepresented the status of the accounts and misrepresented Sullivan's rights to that account.

335. Sullivan's reliance on these oral and written promises was reasonable under the circumstances, as Defendants represented the "brain trust" of Archegos and regularly spoke on behalf of management.

336. Defendants knew and intended for Sullivan to rely on the oral and written promises.

337. As a direct and proximate result of the Defendants' oral and written promises, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief.

338. As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Sixteen.

## COUNT SEVENTEEN
### Professional Negligence or Professional Malpractice
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

339. Sullivan reincorporates and realleges ¶¶ 1-338 by reference herein as if stated in full.

340. As stated fully herein, the above-referenced Defendants owed Sullivan a duty of care imputed both through the Plan Contracts, the employer-employee relationship, and implied at law due to the undue influence exerted upon Sullivan to induce reliance on the Defendants.

341. Defendants are investment bankers and professionals with years of extensive formal learning and training, and regulation, and a code of conduct imposing standards upon the

profession.  Defendants each also served in a managerial position vested with Hwang's authority to act on behalf of Archegos.

342.    Defendants breached their respective duties of care by recklessly failing to manage the Plan, by failing to responsibly manage the investing strategy of the Plan's funds, and by failing to obey the proper industry standard protocols in managing and investing the funds, by doctoring research memorandums to shield the truth of the Fund's issues, by disregarding the Prime Brokers requirements to provide margin.

343.    As a direct and proximate result of the Defendants' professional negligence and malpractice, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief.

344.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Seventeen.

**COUNT EIGHTEEN**
**Civil Conspiracy**
(Against All Defendants)

345.    Sullivan reincorporates and realleges ¶¶ 1-344 by reference herein as if stated in full.

346.    As set forth in detail above, each of the Defendants in this action has committed a statutory or tortious violation against the Sullivan with regard to the Plan run by Archegos.  What began as a series of unfortunate events over time, morphed into an intentional and fraudulent scheme to defraud, through fraud within Archegos and improper activities with regard to public entities and the prime brokers.

347.    As discussed throughout this Complaint, each Defendant has made at least one overt act to further the agreement and Archegos' ability to continue operating regardless of the soundness of their investments or the likely impact on Archegos' employees who had invested their hard-earned money with Hwang based on promises of security and potential growth.

348.    Moreover, as described throughout the Complaint, each Defendant intentionally or knowingly participated in the furtherance or support of the fraud against Sullivan.  Defendants have intentionally participated in the furtherance of the fraud by, inter alia, , making supporting misrepresentations, establishing an environment of fear and obedience to induce reliance, and harboring fraudulently transfer of funds.

349.    As a direct and proximate result of the Defendants' securities fraud, Sullivan has suffered, and continue to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief.

## COUNT NINETEEN
### Tortious Interference With A Contract
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Archegos Fund LP, the Foundation, Hwang, Mills, Halligan, Jones, Becker, and Pae)

350.    Sullivan reincorporates and realleges ¶¶ 1-349 by reference herein as if stated in full.

351.    As set forth in detail above, Defendants Hwang, the Foundation, Pae, Mills, Jones, Becker, and Halligan tortiously interfered with Sullivan's contractual rights under the Plan.

352.    Sullivan entered into a valid contractual agreement with Archegos, electing to contribute his deferred compensation to Archegos every year, in exchange for the option to withdraw his funds when he chose to exit the company.

353.    Hwang, Pae, Mills, Jones, Becker, and Halligan were well aware of this contract, as they were responsible for designing and implementing the Plan, as well as inducing Sullivan to enter into this agreement, promising them no risk and sound financial management.

354.    In the wake of the collapse, Hwang, Pae, Mills, Jones, Becker, and Halligan met and discussed what to do about the deferred compensation.

355.    These defendants decided that Sullivan was not entitled to any deferred compensation when he left the firm, and directed Archegos not to pay Sullivan any of his deferred compensation.

356.    Upon leaving Archegos, Sullivan was not paid any deferred compensation, in breach of his contractual agreement.

357.    As a direct and proximate cause of Hwang, Pae, Mills, Jones, Becker, and Halligan's actions, Sullivan has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and any other appropriate relief.

358.    As alleged with particularity above and below in Count Twenty, Hwang and Archegos maintain absolute control over the Foundation, which operates as Archegos' alter ego. Therefore, the Foundation is equally liable to Sullivans on Count Twenty.

**COUNT TWENTY**
**Alter Ego Liability**
(Against Archegos Capital Management LLC, Archegos Capital Management LP, Hwang, and the Foundation)

359.    Sullivan reincorporates and realleges ¶¶ 1-358 by reference herein as if stated in full.

360.    As stated more fully herein, Archegos, Hwang, and the Foundation, while legally separate, effectively functioned as a single unit during the relevant time period.

361.   Hwang was the founder of both entities and indisputably dominated both entities as well.  No significant investment decisions were made at either entity without Hwang's approval.

362.   The Foundation, by Hwang's own admission, partially serves as a tax shelter to avoid payment of capital gains taxes.  Archegos work product was regularly used to support Foundation investments, and upon information and belief, Hwang used both personal funds and Archegos funds to purchase securities for the Foundation.  The Foundation was treated as a reserve of funds and assets for Archegos and Hwang.  Hwang intended to, and attempted to, use the Foundation assets to recapitalize the Fund when Archegos crashed.

363.   Similarly, Hwang maintained absolute control over both entities.  Upon information and belief, Hwang was well aware of the risks inherent to his investments over time, and used the Foundation as an escape pod in the event of another indictment or enforcement action.  Hwang regularly bragged about using Archegos to support the Foundation, and commonly told employees that if he were ever in trouble again with the SEC or Department of Justice, he would simply move to the Foundation.

364.   At Archegos, Hwang similarly loomed large.  Hwang was well-known within Archegos for running an operation with little appetite for dissent or questioning the wishes of its founder, Hwang.  Upon information and belief, Hwang regularly moved money from Archegos for his own personal use, intermingling funds between the Foundation, Archegos, and Hwang himself.

365.   Upon information and belief, Archegos and the Foundation—which also share many staff and an office space—lack any meaningful corporate separateness, and should be treated as a single entity for purposes of this litigation.  Upon Archegos' demise, 15-30 Archegos employees were offered positions and/or moved full time to the Foundation.

366.     As a result of this failure to recognize corporate separateness and intermingling of funds, Hwang, Archegos, and the Foundation should be treated as a single entity for liability purposes, and Hwang can be held personally liable for acts taken in a corporate capacity by himself and the other members of his senior management team.

## **PRAYER FOR RELIEF**

WHEREFORE, Sullivan prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.     Enter judgment against Defendants Archegos Capital Management LP, Archegos Capital Management LLC, the Fund, EWM Global, the Foundation, Hwang, Pae, Mills, Halligan, Becker, and Jones, in their individual and personal capacities, jointly and severally, ordering repayment to the Plan and allocation to Sullivan of an amount necessary to make good all losses to Sullivan's Individual Plan Account under the Plan caused by Defendants' breaches of their fiduciary duties, and to restore all profits or unrealized gains to Sullivan's account.

B.     In the alternative to the relief sought in A, Defendants Archegos Capital Management LP, Archegos Capital Management LLC, the Fund, EWM Global, the Foundation, Hwang, Pae, Mills, Halligan, Becker, and Jones in their individual and personal capacities, jointly and severally, for all losses to the Plan as a whole and unrealized gains attributable to the breach of any fiduciary.

C.     Enter judgment ordering the Foundation to disgorge any Plan assets improperly allocated to the Foundation.

D.     Enter judgment against Defendants Archegos Capital Management LP, Archegos Capital Management LLC, the Fund, EWM Global, the Foundation, Hwang, Pae, Mills, Halligan, Becker, and Jones for the amount of $100 per day pursuant to §29 U.S.C. 1132(c), payable for each violation thereunder, to Sullivan.

E.     Enter judgment declaring the Foundation an alter ego of Defendants Archegos Capital Management LP, Archegos Capital Management LLC, and Hwang.

F.     Enter judgment enjoining and directing Defendants Archegos Capital Management LP, Archegos Capital Management LLC, the Fund, and the Foundation to comply in all respects with the terms and conditions of the Plan, to pay Plan benefits to Sullivan in an amount to be determined at trial, and to provide any required documentation to Sullivan related to Plan assets.

G.     Enter judgment removing the Defendants as administrators of the Plan and appointing a suitable administrator to be determined in this proceeding;

**H.**     Awarding damages in an amount to be determined at trial, plus prejudgment and post judgment interest, to compensate Sullivan for all non-monetary and/or compensatory damages not to be less than $50,000,000;

**I.**      An award of punitive, consequential, and/or liquidated damages;

**J.**     Prejudgment and post judgment interest on all amounts due;

**K.**     An award of costs that Sullivan incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

**L.**      Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BROWN RUDNICK LLP**

By:   *s/ Michael J. Bowe*
　　　Michael J. Bowe
　　　Lauren Tabaksblat
　　　7 Times Square
　　　New York, New York 10036
　　　Telephone: 212-209-4800
　　　Facsimile: 212-209-4801
　　　ltabaksblat@brownrudnick.com
　　　mbowe@brownrudnick.com

　　　Meghan McCafferty
　　　(*pro hac vice forthcoming*)
　　　One Financial Center
　　　Boston, MA 02111
　　　Telephone: 617-856-8236
　　　Facsimile: 617-289-0636
　　　mmccafferty@brownrudnick.com

　　　*Counsel for Plaintiff*